OPINION
{¶ 1} This timely appeal comes for consideration upon the record in the trial court, the parties' briefs, and their oral arguments to this Court. Defendants-Appellants, the Tri-State Group, Inc. and Glenn Straub, appeal the decision of the Belmont County Court of Common Pleas that permanently enjoined Appellants from engaging in certain activities, found them jointly and severally liable for certain environmental violations, ordered closure of a flyash storage site, and assessed a civil penalty totaling $362,185.00. Appellants raise eleven assignments of error in this appeal, ranging from evidentiary issues to Straub's individual liability for his corporation's actions to the amount of the civil penalty. For the following reasons, Appellants' assignments of error are meritless and the trial court's decision is affirmed.
 Facts {¶ 2} Tri-State is an Ohio corporation fully owned by Straub. Straub is also the sole shareholder of at least two other Ohio corporations, Ohio River Sand Gravel and Burrell Industries. In the early 1980's, Tri-State applied for a Permit to Install (PTI) a flyash disposal site. Flyash is a waste product produced in certain industries which, for regulatory purposes, is designated as non-toxic and non-hazardous, but contains heavy metals in amounts sufficient to contaminate surrounding water supplies. Nevertheless, the Ohio Environmental Protection Agency has approved some beneficial uses for flyash. The proposed location for the flyash disposal site was an old sand and gravel pit on property owned by Ohio River Sand Gravel and was next to an Ohio Edison plant that produced flyash.
 {¶ 3} The proposed site was also located above an aquifer. That aquifer is an excellent source of drinking water and is one of the most productive types of aquifers in the State of Ohio. There was no natural barrier between the proposed site and that aquifer. To ensure that the flyash did not contaminate that groundwater source, the OEPA required that Tri-State install a protective liner, a wastewater disposal system, and ground water monitor wells. The PTI further set forth requirements for closing the site after it had been filled.
 {¶ 4} Tri-State was also required to apply for a National Pollutant Discharge Elimination System (NPDES) permit in order to discharge the leachate into a settling pond. The NPDES permit required that Tri-State conduct monthly tests of the ground water monitor wells and report the results of those tests to the OEPA in monthly operating reports (MORs). The OEPA personnel would then review these MORs for signs of contamination. As the OEPA personnel explained, it employed a self-reporting system to check for groundwater contamination.
 {¶ 5} After reviewing Tri-State's proposals, the OEPA issued the PTI on May 30, 1985, and the NPDES permit on December 12, 1985. Subsequently, the PTI was renewed. Tri-State also filed an application to renew its NPDES permit, which was set to expire on December 9, 1990, but the OEPA has not ruled on that application.
 {¶ 6} Tri-State accepted flyash from the nearby Ohio Edison plant in 1985 and 1986. At that time, Eugene Kiral was the operations manager for the site. He was operations manager of Ohio River Sand Gravel, not Tri-State, but nevertheless oversaw the flyash disposal site at Straub's request. Kiral testified that he received all his instructions about the site from Straub. His job was to ensure that the site complied with the applicable permits and to collect information for Straub so Straub could make informed decisions about the site. The only person in Straub's corporate structure that Kiral reported to was Straub himself. After 1986, Tri-State lost their contract with Ohio Edison and did not place any additional flyash on site.
 {¶ 7} In November 1988, a landslide washed out a portion of the flyash pit. Soon after the washout, Straub appeared onsite to direct the cleanup and authorized remedial efforts to prevent another washout. For example, he ordered that his employees build a reinforced embankment to guard against further washouts and authorized the placement of collection tanks to collect the leachate from the site given the fact that the washout damaged the wastewater treatment system. Straub testified that he knew the tank collection system was a temporary system, but he never sought approval of that system from the OEPA and never replaced that system with another one in compliance with the PTI. The washout also destroyed one of the ground water monitor wells and that well was never replaced.
 {¶ 8} Over time, more problems occurred at the site. For instance, most of the remaining ground water monitor wells were either destroyed or left capless, rendering their results invalid. Since Tri-State did not properly maintain the ground monitoring system, the OEPA could not determine whether the flyash site was contaminating the aquifer. After the washout, the OEPA began notifying Tri-State that it was not complying with its permits and repeatedly asked Tri-State to do so. Tri-State refused.
 {¶ 9} Tri-State never capped the site in accordance with the PTI. That permit required that Tri-State use a particular type of synthetic cover to cap the site. At one point, Tri-State placed asphalt grindings on the site and in either 1992 or 1993 it covered the site with an uneven layer of soil. At the time of trial, Tri-State had done nothing more with the site and vegetation was growing on it.
 {¶ 10} In 1996, Tri-State sold most of its assets. After this, it was no longer an operating company. Nevertheless, Tri-State was still obligated to maintain the flyash site. After the sale Straub was Tri-State's only corporate officer. According to federal law, a corporate officer had to sign the MORs and some of them submitted after the sale were not properly signed. The OEPA informed Straub that a corporate officer had to sign the MORs, but Straub disagreed and did not sign them.
 {¶ 11} After the sale, Tri-State had substantial assets. In 1997, Tri-State had $10,478,400 in assets. Between 1997 and 2000, Tri-State distributed two million dollars to Straub, paid his daughters' company 1.9 million dollars in management fees, and loaned the bulk of the remainder to other companies affiliated with Straub at no interest with no assurances that the money would be repaid. By the end of 2000, Tri-State's assets were $6,606,546.
 {¶ 12} On May 4, 2000, the State filed a complaint for injunctive relief and a civil penalty against both Tri-State and Straub. Both defendants answered the complaint. In their answer, the defendants pled the affirmative defenses of laches, waiver, and estoppel. Subsequently, the trial court granted the State's motion to strike those affirmative defenses.
 {¶ 13} The State and Straub filed cross-motions for summary judgment. The State sought summary judgment on the issue of liability, including Straub's individual liability. Straub sought summary judgment on all counts. The trial court sustained the State's motion for summary judgment regarding Tri-State's liability, but denied its motion for summary judgment regarding Straub's individual liability. It concluded there were genuine issues of material fact regarding whether Straub was personally liable for Tri-State's failure to comply with the permits.
 {¶ 14} The matter proceeded to a bench trial on three issues: 1) the terms of a permanent injunction; 2) the appropriate civil penalty for noncompliance with the permits; and, 3) Straub's individual liability for the noncompliance. The trial court eventually filed two entries. In the first entry, it set forth its findings of fact and conclusions of law. The trial court's second entry was its judgment entry ordering the permanent injunction, assessing the civil penalty, and finding Straub individually liable for the noncompliance with the permits. It is from this entry that Appellants timely appeal.
 Disqualification of the Trial Judge {¶ 15} In their first assignment of error, Appellants argue:
 {¶ 16} "Reversal is warranted in this case because the trial court's decision is based on passion and bias."
 {¶ 17} As each party acknowledges, Appellants filed an affidavit of disqualification with the Ohio Supreme Court after the trial but before the trial court entered its decision. This affidavit was based on the fact that the trial court asked over one hundred sixty substantive questions during direct and cross examination of the witnesses. Chief Justice Moyer issued an opinion, which concluded that the affidavit of disqualification was not well taken. In re Disqualification of Solovan,100 Ohio St.3d 1214, 2003-Ohio-5484.
 {¶ 18} In this appeal, Appellants again argue that the trial court's decision was the result of passion and bias. And the basis for this argument again is the fact that the trial court asked over one hundred sixty substantive questions of the witnesses. In addition, Appellants argue that the trial court's decision to admit certain evidence into the record demonstrates the trial court's prejudice.
 {¶ 19} When the Chief Justice dismisses an affidavit of disqualification as not well taken, "the Chief Justice's ruling is res judicata as to the question." State v. Rogers (1985),17 Ohio St.3d 174, 185-186; see also State v. Getsy,84 Ohio St.3d 180, 185, 1998-Ohio-0533 (Following and applying Rogers). In this case, the Chief Justice found that Appellants' affidavit of disqualification was not well taken. Accordingly, the issue is res judicata and we cannot address the merits of Appellants' argument. Appellants' first assignment of error is meritless.
 Summary Judgment {¶ 20} In their second assignment of error, Appellants argue:
 {¶ 21} "The trial court erred in granting summary judgment to the State against Tri-State on counts 1, 2 and 3 of the complaint."
 {¶ 22} The trial court granted the State's motion for partial summary judgment. Accordingly, it found that Tri-State committed the violations of R.C. 6111.07(A) specified in the three counts of the State's complaint. Appellants argue that the trial court erred when it decided to do this since the State failed to present any evidence that the flyash had actually caused any environmental damage.
 {¶ 23} Appellants' argument in support of this assignment of error is a paragraph long with no citations to the record or any authority. Instead, Appellants simply refer to the arguments contained in their response to the State's motion for summary judgment. Their substantive argument against granting summary judgment in that response is again only a paragraph long. In contrast, the State filed voluminous material in support of their motion for summary judgment. The State's motion was twenty-nine pages long. Attached to that motion were three affidavits with attached exhibits, which were hundreds of pages long, and three depositions with attached exhibits. Those depositions alone were seven hundred and sixty pages.
 {¶ 24} The Appellate Rules require that a party support each of its assignments of error with "[a]n argument containing the contentions of the appellant * * * and the reasons in support of the contentions, with citations to the authorities, statutes, and parts of the record on which appellant relies." App.R. 16(A)(7). Appellants' four-sentence paragraph in support of this assignment of error fails to comply with this requirement. The appellate brief fails to even try to explain why summary judgment was inappropriate.
 {¶ 25} As we have previously stated, an appellate court "has no duty to search the record in order to find support for appellant's position." State v. High, 143 Ohio App.3d 232, 250,2001-Ohio-3530. Under the Appellate Rules, we "may disregard an assignment of error presented for review if the party raising it fails to identify in the record the error on which the assignment of error is based or fails to argue the assignment separately in the brief, as required under App.R. 16(A)." App.R. 12(A)(2). Appellants have not provided us with a legal argument demonstrating why summary judgment was inappropriate. We would have to sift through volumes of evidentiary material to create their arguments for them. Accordingly, we will disregard Appellants' second assignment of error.
 Evidence of Settlement Negotiations {¶ 26} In their third assignment of error, Appellants argue:
 {¶ 27} "The trial court erred in admitting into evidence seven written settlement proposals and negotiation letters between Tri-State and the EPA."
 {¶ 28} According to Appellants, evidence of settlement negotiations is generally inadmissible and this evidence does not fall within one of the exceptions to that general rule. In addition, in their reply brief Appellants argue that the prejudicial effect of admitting this evidence substantially outweighs its probative value.
 {¶ 29} This assignment of error involves a trial court's decision on an evidentiary matter. The admission or exclusion of evidence generally rests within the sound discretion of the trial court. Calderon v. Sharkey (1982), 70 Ohio St.2d 218, 221. The term "abuse of discretion" connotes more than an error of law or judgment; it implies that the court's attitude was unreasonable, arbitrary or unconscionable. Blakemore v. Blakemore (1983),5 Ohio St.3d 217, 219.
 {¶ 30} Evid.R. 408 provides that evidence of settlement negotiations is inadmissible to prove liability for or invalidity of the claim or its amount. But it is admissible when it "is offered for another purpose, such as proving bias or prejudice of a witness, negating a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution." Id. "The fact that an offer to compromise the matters in dispute between the parties was made, is incompetent, either as evidence of a fact from which the liability of the party making the offer may be inferred, or as an admission of such liability." Shererv. Piper Yenney (1875), 26 Ohio St. 476, paragraph one of the syllabus.
 {¶ 31} As this Court recently stated, there are two reasons for excluding this type of evidence. Cummins v. Great Door Supply, Inc., 7th Dist. No. 02 CA 61, 2003-Ohio-4455, ¶ 17. "First, excluding such evidence encourages parties to settle their disputes. * * * Second, settlement negotiations are largely irrelevant to the questions concerning liability because settlements may be reached for reasons having nothing to do with liability." (Citations omitted) Id. at ¶ 17-18.
 {¶ 32} Appellants believe the trial court erred by admitting seven exhibits into evidence, letters from the OEPA and the Attorney General to Tri-State and/or Straub. But the trial court specifically stated that these exhibits were admitted to show "the observations and activities of the agency" and "the extent of the question of knowledge in this case of the position of the EPA on or about the time that was sent." It clearly demonstrated that the evidence was admitted for non-liability purposes.
 {¶ 33} Appellants argue they were prejudiced by the fact that these exhibits were introduced into evidence, but their argument is meritless. First, we presume a court relies only on relevant, material, and competent evidence in a bench trial. Parrish v.Machlan (1997), 131 Ohio App.3d 291, 297; Morris v. Pyles, 7th Dist. No. 97 BA 43, 2001-Ohio-3204. There is nothing in the trial court's findings of fact or conclusions of law that indicate it found either Tri-State or Straub liable because of their settlement negotiations. Accordingly, we must presume that the trial court did not improperly rely on this evidence to establish liability.
 {¶ 34} Second, the only time the trial court discusses anything related to the settlement negotiations in its conclusions is when it is deciding whether there are factors that mitigated Appellants' behavior. It concluded that it could not mitigate the civil penalty because of "governmental indifference" to Tri-State's failure to comply with the permits, presumably because of the OEPA's attempts to achieve compliance as evidenced by these documents. And it mitigated Appellants' civil penalty because the State began the civil litigation long after it initially tried to settle the matter. Thus, the trial court only considered this evidence when it was considering the penalty it would impose, not when determining whether it should impose a penalty.
 {¶ 35} Appellants cannot demonstrate that they were prejudiced by the admission of this evidence. The trial court did not use this evidence to determine liability, the only purpose expressly forbidden by Evid.R. 408. Instead, it used this evidence to determine the amount of the civil penalty Appellants were obligated to pay since they were found liable. This combined with the fact that trial courts are presumed to rely only on relevant, material, and competent evidence, leads to the conclusion that the trial court did not abuse its discretion when it admitted these exhibits into evidence. Accordingly, Appellants' third assignment of error is meritless.
 Closure Requirements {¶ 36} In their fourth assignment of error, Appellants argue:
 {¶ 37} "The trial court erred in imposing ten (10) mandatory closure requirements on Tri-State, seven of which were not specified in the permit closure plan."
 {¶ 38} Appellants argue that the original permit did not contain seven of the ten requirements in the trial court's judgment entry and that the State did not specifically request those requirements prior to trial. They claim that the trial court abused its discretion by compelling Tri-State to meet these requirements since the original permit contained all the closure requirements the OEPA thought were necessary at the time it issued the permit.
 {¶ 39} The State brought this action under R.C. 6111.07. That statute provides that "[t]he attorney general, upon written request of the director [of the OEPA], shall bring an action for an injunction against any person violating or threatening to violate this chapter or violating or threatening to violate any order, rule, or condition of a permit issued or adopted by the director pursuant to this chapter." R.C. 6111.07(B). Appellants argue that this statute does not set forth the statutory prerequisites for the issuance of an injunction. They believe that this action must be governed by general equitable principles and that the State had to prove irreparable harm before the trial court could issue an injunction.
 {¶ 40} The case Appellants cite in favor of their position,State ex rel. Miller v. Anthony, 72 Ohio St.3d 132, 1995-Ohio-0039, dos not apply to this situation. In Miller, the Ohio Supreme Court held that general equitable principles applied in a nuisance abatement action. Id. at 136. But this was in the context of whether or not there was a right to a jury trial. Since the action was seeking an injunction, it was equitable in nature and, therefore, there was no right to a jury trial. Id.
 {¶ 41} A trial court does not need to balance equities when "an injunction is authorized by a statute designed to provide a governmental agent with the means to enforce public policy." SeeAckerman v. Tri-City-Geriatric Health Care, Inc. (1978),55 Ohio St.2d 51, 56; 56 Ohio Jur.3d 109, Injunctions, Section 13. In such a situation, the State need not prove irreparable harm; it must merely show that the statutory requirements for the injunction have been met. Id.
 {¶ 42} In this case, the statute requires that the State prove that someone is "violating or threatening to violate this chapter or violating or threatening to violate any order, rule, or condition of a permit issued or adopted by the director pursuant to this chapter." R.C. 6111.07(B). Once it does so, the trial court has the authority to issue an injunction. This is a statute designed to provide a governmental agent with the means to enforce a public policy. The legislature gave the trial court the ability to issue a statutory injunction without a demonstration of the common-law requirement of irreparable harm. Accordingly, Appellants' argument that equitable principles must apply is meritless.
 {¶ 43} Here, the trial court granted summary judgment to the State on the issue of whether Tri-State failed to comply with its permits. Thus, the trial court had the statutory authority to issue the injunction. The evidence at trial, specifically the testimony of the State's expert witnesses, Bruce Goff and Jane Jacobs, establishes that the only way to ensure both full compliance with the permits and that there is no environmental damage from the site is to have the types of requirements contained in the trial court's judgment entry. Accordingly, the trial court did not abuse its discretion when it included all ten of the closure requirements in its order. Appellants' fourth assignment of error is meritless.
 Takings Clause {¶ 44} Appellants' fifth assignment of error argues:
 {¶ 45} "The trial court erred in imposing mandatory deed restrictions on Tri-State's property in violation of the Takings Clause of the United States and Ohio Constitutions."
 {¶ 46} Both Section 19, Article I of the Ohio Constitution and the Fourteenth and Fifteenth Amendments of the United States Constitution prohibit the government from taking private property for public use without just compensation. Palazzolo v. RhodeIsland (2001), 533 U.S. 606, 617; State ex rel. R.T.G., Inc. v.State, 98 Ohio St.3d 1, 2002-Ohio-6716, ¶ 33. "The clearest sort of taking occurs when the government encroaches upon or occupies private land for its own proposed use." Palazzolo at 617. The government must compensate someone for even a minimal permanent physical occupation of real property. Id. Of course, the trial court has not ordered any physical encroachment on Appellants' property in this case, but a physical encroachment is not the only type of taking.
 {¶ 47} "The question of what [else] constitutes a `taking' for the purposes of the Fifth Amendment has proven to be a problem of considerable difficulty." Penn Cent. Transp. Co. v.New York City (1978), 438 U.S. 104, 123. For instance, governmental regulation of property can sometimes constitute a taking. See Pennsylvania Coal Co. v. Mahon (1922), 260 U.S. 393
("[W]hile property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking."). Thus, when a "regulation denies all economically beneficial or productive use of the land," then it is a taking. Lucas v. SouthCarolina Coastal Council (1992), 505 U.S. 1003, 1015. Likewise, when a regulation requires a physical invasion of property, then it constitutes a taking. Id. Finally, land use regulation, such as zoning, is a taking if it does not substantially advance legitimate state interests. Agins v. Tiburon (1980),447 U.S. 255, 260; State ex rel. Shemo v. Mayfield Hts.,95 Ohio St.3d 59, 63-64, 2002-Ohio-1627.
 {¶ 48} Of course, some regulations deprive the property of less than all of its economically beneficial use and do not require a physical invasion of the property. In Penn Cent., the United States Supreme Court formulated an ad hoc balancing test to serve as a guidepost when determining when a regulation `goes too far' and results in a compensable taking in these types of cases. R.T.G. at ¶ 34. "The three criteria that Penn Cent.
identified to be examined in regard to a regulatory taking are (1) the nature of the governmental regulation, (2) the economic impact of the regulation on the claimant, and (3) the extent to which the regulation interfered with distinct investment-backed expectations." Id., citing Penn Cent. at 124; Palazzolo at 617. The Ohio Supreme Court has recently noted that this type of analysis is not easy. "Regulatory-takings issues are complex and difficult and have defied attempts to provide a simple solution." Id. at ¶ 1. A property owner bears the burden of proving beyond fair debate that a particular restriction is a regulatory taking.Shemo v. Mayfield Hts., 88 Ohio St.3d 7, 9, 2000-Ohio-0258;Gerijo, Inc. v. Fairfield, 70 Ohio St.3d 223, 1994-Ohio-0432, syllabus.
 {¶ 49} In Ohio, the legislature has codified the right to be compensated for a taking in R.C. Chapter 163. Those statutes govern the appropriation of property and an appropriation case under that chapter "seeks monetary compensation for real property that was taken from the property owner and for the damages to the residue remaining with the property owner." R.T.G. at ¶ 29. Someone who believes that the government has taken his or her property may seek a writ of mandamus to compel the appropriate governmental body to commence appropriation proceedings. SeeState ex rel. Sekermestrovich v. Akron, 90 Ohio St.3d 536, 537, 2001-Ohio-0223; State ex rel. Levin v. Sheffield Lake, 70, Ohio St.3d 104, 109, 1994-Ohio-0385.
 {¶ 50} The only difference between the alleged taking in this case and any other regulatory taking is that the taking was the result of an order imposed by a trial court using its discretion to fashion a permanent injunction. If the OEPA or a local zoning board ordered the same kind of land use restriction, Appellants could use mandamus to obtain relief. The mere fact that the trial court ordered the land use restriction in this case makes the underlying claim no different.
 {¶ 51} In an appeal from the order that comprises the alleged taking, we do not have the kind of evidence necessary to decide whether the trial court's order is a regulatory taking. The tests courts must use to determine whether there is a taking require certain types of evidence that are not present in this case. For example, the record is devoid of any evidence of the economically beneficial uses of this property. Accordingly, this Court cannot determine whether the trial court's order deprives Appellants of any economically beneficial uses of their property. Likewise, there is no evidence regarding the need to permanently prevent the property from being used for residential or commercial purposes. Accordingly, this Court cannot determine whether the deed restriction substantially advances a legitimate State interest. This essentially means that this Court cannot apply thePenn Cent. test in this case.
 {¶ 52} At this stage in the litigation, the only thing this court can be sure of is that there is neither a physical encroachment on nor physical invasion of Appellants' property. Appellants cannot prove a regulatory taking because they have not been able to present evidence regarding whether the trial court's actions are a taking. This is, of course, not Appellants' fault since this was not an issue at trial. Nor could it have been since the alleged taking, the court's order, did not take place until after trial. This is why it would be appropriate for Appellants to obtain a writ of mandamus ordering the appropriate governmental body to begin appropriation proceedings to determine if the trial court's order qualifies as a taking. On appeal, we conclude Appellants' argument that there has been a taking is meritless.
 Laches, Estoppel, and Waiver {¶ 53} In their sixth and seventh assignments of error, Appellants argue:
 {¶ 54} "The trial court erred in striking Tri-State's affirmative defense of laches."
 {¶ 55} "The trial court erred in striking Tri-State's affirmative defenses of waiver and estoppel."
 {¶ 56} According to Appellants, a court must determine whether the doctrine of laches is applicable against the State under the facts of each individual case. They further argue that the State failed to sue them for about twelve years after it first notified them of their failure to comply with the permits. They contend that this delay was for an unreasonable and unexplained time. Accordingly, they believe that they are entitled to raise the affirmative defense of laches.
 {¶ 57} Generally, courts have "been loathe to apply doctrines of waiver, laches or estoppel to governmental entities and arms thereof." Gold Coast Realty, Inc. v. Board of Zoning Appeals ofCity of Cleveland (1971), 26 Ohio St.2d 37, 39. Thus, "laches is generally no defense to a suit by the government to enforce a public right or protect a public interest." Ohio State Bd. ofPharmacy v. Frantz (1990), 51 Ohio St.3d 143, paragraph three of the syllabus. "The principle that laches is not imputable to the government is based upon the public policy in enforcement of the law and protection of the public interest. * * * To impute laches to the government would be to erroneously impede it in the exercise of its duty to enforce the law and protect the public interest." (Citations omitted) Id. "The rationale behind this rule is one of public policy; the public should not suffer due to the inaction of public officials." Still at ¶ 11; Campbell v.Campbell (1993), 87 Ohio App.3d 48, 50.
 {¶ 58} Likewise, "[t]he government cannot be estopped from its duty to protect public welfare because public officials failed to act as expeditiously as possible." Ohio State Bd. ofPharmacy at paragraph two of the syllabus; see also Refining Marketing Co. v. Brennan (1987), 31 Ohio St.3d 306, 307. "If a government agency is not permitted to enforce the law because the conduct of its agents has given rise to an estoppel, the interest of all citizens in obedience to the rule of law is undermined. * * * To hold otherwise would be to grant defendants a right to violate the law." Id. at 146.
 {¶ 59} And these same principles hold true for the defense of waiver when the State is trying to protect public interests. "Waiver is a concept which applies to an individual who freely waives his own rights and privileges." Campbell at 50. But the public rights are by definition not individual rights and no individual may waive public interests by his or her action or inaction. Id. Once again, courts do not allow the public to suffer due to the actions or inactions of public officials. Id.
 {¶ 60} Because the rule against applying these defenses against the State exists because of public policy, they can only be used against the State "when general public-policy interests against [their] application are outweighed by other public-policy interests served by applying" those defenses. Still at ¶ 11. Thus, in paternity actions the State's strong public policy in favor of establishing a parent-child relationship outweighs the policy in favor of allowing the State to enforce a public right or protect a public interest. Id; see also Adams Cty. ChildSupport Enforcement Agency v. Osborne (May 3, 1996), 4th Dist. No. 95CA592. And the public policy in favor of public confidence in the decisions of state agencies may outweigh competing public policies, thus allowing people to rely on an administrative interpretation of a rule or law. Pilot Oil Corp. v. Ohio Dept.of Transp. (1995), 102 Ohio App.3d 278, 281. The distinguishing factor when determining whether to apply the equitable doctrine of laches against the State is not whether the State is trying to enforce a public or private right. Instead, the relevant question is whether applying that doctrine serves any public policy interest and whether that interest outweighs the public policy interest against applying that doctrine.
 {¶ 61} Here Appellants have not even tried to argue that there is a public policy interest in favor of applying any of these defenses against the State. And this case is a perfect example of why courts generally refuse to apply those defenses. By bringing this action, the State is trying to protect both the environment and the health of its citizens. The public should not be injured merely because the governmental agents in charge of protecting those interests have been slow to do so. These defenses cannot apply against the State in this case. The trial court did not err when it struck them as affirmative defenses. Appellants' sixth and seventh assignments of error are meritless.
 Straub's Liability {¶ 62} Appellants' eighth and ninth assignments of error address whether or not the trial court erred in finding Straub personally liable for the violations. Those assignments of error argue:
 {¶ 63} "The trial court erred in holding Glenn Straub personally liable under the participation in wrongful acts doctrine."
 {¶ 64} "The trial court erred in finding Glenn Straub personally liable under the doctrine of piercing the corporate veil."
 {¶ 65} The trial court found that Straub was liable under two distinct theories: 1) the participation in wrongful acts doctrine and 2) the doctrine of piercing the corporate veil. Appellants argue that neither of these doctrines applies, so they believe that Straub should not have been found liable. Because we conclude that the trial court properly pierced the corporate veil, we will not address whether the participation in wrongful acts doctrine applies in this case.
 {¶ 66} Shareholders, officers, and directors of a corporation are not normally liable for a corporation's debts. BelvedereCondominium Unit Owners' Assn. v. R.E. Roark Cos., Inc.,67 Ohio St.3d 274, 287, 1993-Ohio-0119. This is because "`a corporation is a legal entity, apart from the natural persons who compose it.'" Id., quoting State ex rel. Atty. Gen. v. Standard Oil Co.
(1892), 49 Ohio St. 137, paragraph one of the syllabus. But the shareholders of a corporation may be personally liable for some corporate debts if the corporation is not used properly since a corporation "`is a mere fiction, introduced for convenience in the transaction of its business, and of those who do business with it.'" Id. Like every other legal fiction, the fiction of the corporation as a separate entity may be disregarded when urged to an intent and purpose not within its reason and policy. Id. Thus, the veil of the corporate entity can be pierced and individual shareholders be held liable for corporate misdeeds when it is inequitable to allow the shareholders to "hide behind the fiction of the corporate entity." Id.
 {¶ 67} In Belvedere, the Ohio Supreme Court set out a three-pronged test to determine whether the corporate veil can be pierced.
 {¶ 68} "The corporate form may be disregarded and individual shareholders held liable for wrongs committed by the corporation when (1) control over the corporation by those to be held liable was so complete that the corporation has no separate mind, will, or existence of its own, (2) control over the corporation by those to be held liable was exercised in such a manner as to commit fraud or an illegal act against the person seeking to disregard the corporate entity, and (3) injury or unjust loss resulted to the plaintiff from such control and wrong." Id. at paragraph three of the syllabus.
 {¶ 69} Because one of the purposes of incorporation is to limit the liability of individual shareholders, the party seeking to have the corporate form disregarded bears the burden of proof.Starner v. Guardian Industries (2001), 143 Ohio App.3d 461,469; Univ. Circle Ctr. Corp. v. Galbreath Co. (1995),106 Ohio App.3d 835, 840. When determining whether to pierce the corporate veil a trial court must decide each case sui generis, on its own facts. Yo-Can, Inc. v. The Yogurt Exchange, Inc.,149 Ohio App.3d 513, 2002-Ohio-5194, ¶ 45.
 {¶ 70} "Because of the delicate judgments involved in assessing the special facts in each case, and ultimately, in deciding whether the corporation has been used to an end subversive to its policy * * * or when it would be `unjust' not to disregard the corporate entity, * * * `piercing the corporate veil' is primarily a matter for the trier of fact.'" (Citations omitted) Clinical Components, Inc. v. Leffler Industries, Inc.
(Jan. 22, 1997), 9th Dist. No. 95CA0085. Thus, our review of the trial court's decision is limited to finding whether competent, credible evidence supports its decision. Longo Constr., Inc. v.ASAP Tech. Serv., Inc. (2000), 140 Ohio App.3d 665, 671;Sanderson Farms, Inc. v. Gasbarro, 10th Dist. No. 01AP-461, 2004-Ohio-1460, ¶ 25.
 {¶ 71} Appellants contend that the State failed to meet any of Belvedere's three prongs. In response, the State indicates what evidence it believes supports the trial court's conclusion that the State proved each prong of the Belvedere test.
 {¶ 72} The first prong of the Belvedere test "is a concise statement of the alter ego doctrine; to succeed a plaintiff must show that the individual and the corporation are fundamentally indistinguishable." Belvedere at 288. In this case, Straub was Tri-State's sole shareholder. But this fact alone does not prove that his control over Tri-State was "so complete that the corporation has no separate mind, will, or existence of its own." "A corporation is a separate legal entity from its shareholder even where there is only one shareholder in the corporation."Humitsch v. Collier (Dec. 29, 2000), 11th Dist. No. 99-L-099.
 {¶ 73} "[I]n applying the `instrumentality' or `alter ego' doctrine, the courts are concerned with reality and not form, with how the corporation operated and the individual defendant's relationship to that operation." DeWitt Truck Brokers, Inc. v.W. Ray Flemming Fruit, Co. (C.A. 4, 1976), 540 F.2d 681, 685. Ohio courts have looked at various factors when determining whether a shareholder's control over a corporation is "so complete that the corporation has no separate mind, will, or existence of its own". These factors include 1) the failure to observe corporate formalities, 2) shareholders holding themselves out as personally liable for certain corporate obligations, 3) diversion of funds or other property of the company property for personal use, 4) absence of corporate records, and 5) the fact that the corporation was a mere facade for the operations of the dominant shareholder(s). LeRoux's Billyle Supper Club v. Ma
(1991), 77 Ohio App.3d 417, 422-423; see also Link v. LeadworksCorp. (1992), 79 Ohio App.3d 735, 744.
 {¶ 74} In this case, there is competent, credible evidence supporting the trial court's conclusion that Straub exercised complete control over Tri-State's activities. Tri-State had not conducted significant corporate meetings for the last fifteen years. Straub's own testimony supports this finding. He testified that Tri-State's directors never met for a board meeting and demonstrated that he was not even sure who had been Tri-State's directors or officers for the last fifteen years. Although he did not know precisely who were officers or directors of Tri-State, he held board meetings with the other directors via telephone conferences. But he admitted that these conferences were not significant corporate transactions.
 {¶ 75} Corporate records were absent. In a discovery request, the State requested that Tri-State produce all corporate minutes and other records. Those records were not produced. When asked about these documents, Straub testified that he was sure that they existed, but that he did not know where they were or why they were not produced. The trial court found that Straub "evaded, misstated, and otherwise rendered testimony that lacks credibility as to why said documents were not produced." Tri-State's failure to produce those corporate records after being requested to do so demonstrates an absence of corporate records.
 {¶ 76} Straub funneled money from Tri-State to himself, his daughter, and his other business entities. Straub sold most of Tri-State's assets to another company in 1996 for $6,426,000 and testified that Tri-State no longer was an operating company after that sale. In 1997, the year after Tri-State sold its assets, the company made a two million dollar distribution to its sole shareholder, Straub. And from 1997 through 2000, when Tri-State was no longer an operating company, it paid a firm owned and operated by Straub's daughters $1,900,000 in "management fees." The vast majority of Tri-State's assets in any of the years between 1997 and 2000 were loans to other Straub-affiliated companies and Tri-State's tax records show that those loans were no-interest loans with no assurances of repayment. From 1997 through 2000, when Tri-State was not an operating company, its assets declined from $10,478,400 to $6,606,546.
 {¶ 77} Straub treated the corporations he owned as a single whole and those companies were a mere facade for Straub's operations. The man whom Straub named as Tri-State's operations manager, Kiral, testified that he was never employed by Tri-State. Instead, he oversaw the placement of the flyash at the site at Straub's request and made sure the site complied with all applicable permits, once again at Straub's orders. He got all directions about the site from Straub and the only person in the corporate structure he ever talked to was Straub. He further testified that only Straub had the authority to authorize the placement of the temporary collection tanks and that Straub made all financial decisions for Tri-State.
 {¶ 78} Waldo testified that he was employed by a different Straub-owned company as a "trouble-shooter" for Straub. After Kiral stopped working for Straub, Waldo oversaw the site on Straub's behalf, looking for vandalism and fixing problems as they occurred. And at Straub's request, Waldo met with some people from the OEPA.
 {¶ 79} Straub's own testimony supports the trial court's conclusion that he completely disregarded the corporate form and ran his operations as he chose. He would use employees from one of his companies for another whenever he desired. He also spoke about how people in his company would be "appointed" an officer of one of his corporations for a day to get a particular issue resolved. When he found out about problems, he brought people in to fix it. And throughout his testimony, he refers to Tri-State as being in charge of building the flyash site and states that his other companies were in charge of operating that site. He continually refers to "one of 50 guys" who works for him that could handle different types of problems. For Straub, it did not matter which of his employees was employed by which company. If they work for one of his companies, then they work for all of them.
 {¶ 80} In his testimony, Straub attempted to show that Tri-State was not his alter ego. He continually referenced the fact that people in his organization had the ability to make decisions on their own. And his testimony contradicted much of Kiral's testimony. The trial court specifically found that Straub's testimony was "incredible" for various reasons. The trier-of-fact is in the best position to assess the credibility of the witnesses presented and to determine the weight to be afforded the evidence offered. State v. DeHass (1967),10 Ohio St.2d 230; State v. Slocum (1998), 131 Ohio App.3d 512.
 {¶ 81} To summarize, the following facts are competent, credible evidence supporting the trial court's conclusion that the State proved the first prong of the Belvedere test: 1) Straub owned 100% of Tri-State's stock; 2) Tri-State did not conduct any significant corporate meetings since 1985; 3) there are no corporate records over that time span; 4) Straub was funneling Tri-State's assets to himself personally, his daughters, and to the other companies he owned; 5) after Tri-State's assets were sold, he was "the only person left in that company, as far as a corporate capacity;" and, 6) he ignored corporate forms when deciding how to finish a particular task. Straub's arguments to the contrary are meritless.
 {¶ 82} The second prong of the Belvedere test requires that the plaintiff show that the control was exercised in such a manner to do a wrongful act. As the Third District has pointed out, this does not mean that the person seeking to pierce the corporate veil needs to prove that the acts were illegal or fraudulent. Wiencek v. Atcole Co., Inc. (1996),109 Ohio App.3d 240, 244. Instead, one who seeks "to disregard the corporate entity may present evidence that the shareholders exercised their control over the corporation in such a manner as to commit a fraud, illegal, or other unjust or inequitable act upon the person seeking to disregard the corporate entity in order to satisfy the second prong of the test enunciated in Belvedere." Id. at 245; see also Stypula v. Chandler, 11th Dist. No. 2002-G-2468, 2003-Ohio-6413, ¶ 19; Capital Plus, Inc. v. Potter
(June 5, 2001), 10th Dist. No. 00AP-1353; Collum v. Perlman
(Apr. 30, 1999), 6th Dist. No. L-98-1291.
 {¶ 83} The trial court found that Straub controlled Tri-State "so completely that he caused the illegal acts, i.e. the violations of the Permits as previously set forth herein." When it granted summary judgment to the State, the trial court found that Tri-State had violated its permits in three ways: 1) by failing to maintain and operate the wastewater treatment system in accordance with the permits; 2) by failing to operate and maintain a ground water monitoring system in accordance with the permits; and, 3) by failing to comply with the monitoring and reporting requirements of the permits.
 {¶ 84} The evidence at trial supports the trial court's conclusion that Straub's control of Tri-State led to each of these violations. First, Kiral testified that although he was operations manager of the site, only Straub had the authority to authorize certain types of expenditures like the placement of the temporary tanks or closing the site and that Straub made all the financial decisions about the site. After the washout, Straub personally went to the flyash site and oversaw its repair. He ordered that the collection tanks be installed and knew that this was a temporary repair which did not comply with the permits. Afterward, he made sure that the site was repaired in the manner he saw fit, but did not authorize or require reconstruction in accordance with the permits. Thus, Tri-State's failure to maintain and operate the wastewater treatment system in accordance with the permits was a direct result of Straub's decisions about the site.
 {¶ 85} Straub's testimony demonstrated that he did not think that it was important to replace the damaged or destroyed ground water monitoring wells. Those wells were never replaced or repaired. When asked if he had any plans to replace the well destroyed by the washout in 1988, Straub responded that he thought there were "plenty of other monitoring wells", so he didn't think it was "that important" to replace that well. And rather than making sure that the well was eventually replaced, he made sure that Tri-State sent letters to the OEPA about the washout-related problems. Once again, the evidence supports the trial court's conclusion that Straub's control of Tri-State and his decisions about the site caused this violation of the permits.
 {¶ 86} The final way in which Tri-State violated the permits is by its improper monitoring of the ground water monitor wells. One of the ways in which Tri-State violated the permit is by not having a corporate officer sign some of the MORs it submitted to the State. Some of the MORs filed after Tri-State was no longer in operation were unsigned, a violation of federal law. Stevenson called Straub, the only corporate officer at that time, to bring this to his attention. But Straub did not see anything wrong with having them unsigned by a corporate officer. Given these facts, competent, credible evidence supports the trial court's conclusion that the State proved the second prong of theBelvedere test.
 {¶ 87} The third prong of the Belvedere test requires "that the shareholder's control over the corporation proximately caused the plaintiff's injury or loss." Id. at 288-289. This flyash site is above "one of the most productive type of aquifers we have in the State of Ohio" which could produce between four and five hundred gallons of water per minute. As the State's expert testified, this aquifer "would be an exceptional source of drinking water." Because of Tri-State's failure to comply with the permits, OEPA personnel have "serious concerns" about contamination of the ground water at the site. But the OEPA is incapable of determining the ground water quality because the existing monitoring system has deteriorated too much. Thus, Tri-State's failure to comply with the permits may have contaminated the ground water and prevents the OEPA from determining whether there is any contamination. Since the evidence supports the trial court's conclusion that Straub was responsible for Tri-State's failure to comply with the permits, he is responsible for the injury caused by that failure to comply with the permits.
 {¶ 88} In conclusion, the evidence supports the trial court's decision to disregard the corporate form and hold Straub personally liable for the violations at the flyash site. Since Straub could be held liable for piercing the corporate veil, it does not matter whether the doctrine of participation in a wrongful act applies in this situation. Accordingly, it appears that Appellants' eighth and ninth assignments of error are meritless.
 Compliance with the NPDES Permit {¶ 89} In their tenth assignment of error, Appellants argue:
 {¶ 90} "The trial court erred in finding a civil penalty should be assessed for violation of the NPDES permit which permit expired ten (10) years prior to the State filing its complaint in this case."
 {¶ 91} They claim that the trial court could not impose a civil penalty for any violation of the NPDES permit after December 9, 1990, since that permit was not renewed and expired on that day. Accordingly, they believe the trial court erred when it calculated the amount of the civil penalty.
 {¶ 92} The State argues that Appellants were required to comply with the terms of the NPDES permit even though it has not been renewed since they filed an application for renewal, which has not yet been acted upon. In support of this argument, the State cites OAC 3724-33-03(B). That section provides:
 {¶ 93} "If a permit renewal application is submitted at least one hundred eighty days prior to the expiration date of the existing permit, and the director does not issue a new permit before the expiration date, the conditions of the expired permit shall continue in force until the director acts on the permit application." Id.
 {¶ 94} While this regulation would appear to dispose of this assignment of error, appearances can be deceiving. The effective date of this version of the regulation was December 30, 2002, more than twelve years after the expiration date of the Appellants' permit and the prior version of this regulation does not contain similar language. The Appellants could not be expected to know that they had to comply with an expired permit in 1991 when the regulation mandating that compliance did not go into effect until 2002.
 {¶ 95} Nevertheless, there is no reason to reverse the trial court's decision regarding the amount of the civil penalty. R.C.6111.04(A)(1) prohibits anyone from causing the placement of "any sewage, sludge, sludge materials, industrial waste or other wastes in a location where they cause pollution of any waters of this state." Any violation of R.C. 6111.04(A)(1) would subject the violator to a civil penalty. See. R.C. 6111.07; R.C. 6111.09.
 {¶ 96} The parties do not dispute that the flyash site produced leachate between 1990 and the date of trial and that Appellants were disposing of that leachate. Straub testified that the collection tank would be pumped out when it was filled and that the contents would be taken to another settling pond facility. It appears that this violates R.C. 6111.04(A)(1). Thus, Appellants would owe a civil penalty regardless of whether they had a valid NPDES permit if the site was producing leachate.
 {¶ 97} Furthermore, the trial court found that Appellants were in violation of two different permits, the NPDES permit and the PTI. Neither party disputes the fact that the PTI was enforceable up to and including the day of trial. The trial court did not increase the amount of the civil penalty for each day of violation because Appellants were violating more than one permit. Likewise, the trial court did not double the days of violation because Appellants were violating two different permits. Thus, the fact that there were violations of two permits did not affect the amount of the civil penalty the trial court imposed upon Appellants.
 {¶ 98} Appellants either were in violation of their NPDES permit or R.C. 611.04(A)(1). In either case, they would be subject to a civil penalty. Furthermore, the civil penalty assessed by the trial court is supported by the violations of the PTI alone. Accordingly, Appellants were not prejudiced by the fact that the trial court assessed a civil penalty for violations of the NPDES permit and their tenth assignment of error is meritless.
 Civil Penalty {¶ 99} In their eleventh and final assignment of error, Appellants argue:
 {¶ 100} "The trial court erroneously applied the several factors to be considered in assessing a civil penalty pursuant to R.C. 6111.09."
 {¶ 101} According to Appellants, the trial court was required to consider certain factors when determining whether to assess a civil penalty and the size of that penalty. Appellants argue that the trial court erred when it concluded that there was a risk of environmental harm, that they were recalcitrant and indifferent, that they received an economic benefit from their non-compliance, and that assessing a civil penalty in this case would deter both them and others from engaging in similar actions.
 {¶ 102} Civil penalties are a tool that can be used to implement a regulatory program. State ex rel. Brown v. Howard
(1981), 3 Ohio App.3d 189, 191, citing United States ex rel.Marcus v. Hess (1943), 317 U.S. 537; Oceanic Steam NavigationCo. v. Stranahan (1909), 214 U.S. 320. R.C. 6111.09(A) provides that "[a]ny person who violates section 6111.07 of the Revised Code shall pay a civil penalty of not more than ten thousand dollars per day of violation." The civil penalty required by R.C.6111.09(A) is "an economic sanction to deter violations of R.C. Chapter 6111 and thereby to promote the goal of clean water in the state of Ohio." Howard at 191.
 {¶ 103} Because of the mandatory language of R.C. 6111.09(A), a trial court has no discretion regarding about whether to impose a civil penalty. Nevertheless, the language of the statute gives it broad discretion to determine the amount of that penalty.State ex rel. Brown v. Dayton Malleable (1982),1 Ohio St.3d 151, 157; see also Howard at paragraph one of the syllabus ("The determination of the amount of penalty, authorized by R.C.6111.09, to be imposed, is left to the `informed discretion' of the trial court based on the totality of the evidence in each case"). The trial court's decision regarding the amount of the civil penalty should only be reversed if it is unreasonable, arbitrary, or unconscionable. Dayton Malleable at 157.
 {¶ 104} When determining the appropriate amount of a civil penalty, the trial court should consider the following factors: 1) the harm or threat of harm posed to the environment by the person violating R.C. 6111.07; 2) the level of recalcitrance, defiance, or indifference demonstrated by the violator of the law (also referred to in case law as the defendant's good or bad faith); 3) the economic benefit gained by the violation; and, 4) the extraordinary costs incurred in enforcement of R.C. 6111.07.Dayton Malleable at 153; Mentor v. Nozik (1993),85 Ohio App.3d 490, 494; Howard at 191. While making this determination, the trial court must remember that because a civil penalty is an economic sanction designed to deter violations of R.C. Chapter 6111, the penalty must be large enough to hurt the offender. State ex rel. Celebrezze v. Thermal-Tron, Inc.
(1992), 71 Ohio App.3d 11, 19; Howard at 191.
 {¶ 105} In this case, the trial court found that Tri-State began to violate its permits after the washout occurred in November 1988. When it entered its findings of fact and conclusions of law, the trial court calculated the total time of non-compliance to be 5,353 days. It assessed a civil penalty of eighty-five dollars for each day of violation, for a total penalty of $455,005.00. But the trial court then mitigated the total penalty. It granted Appellants credit for a reasonable time after the washout for the time that it would have taken them to come into compliance with the permits. Accordingly, it gave them credit of eighty-five dollars a day for 426 days. Likewise, the trial court gave Appellants some credit for the fact that the State delayed initiating litigation until May 4, 2000. Accordingly, it granted Appellants a further credit of fifteen dollars a day for 3,774 days (the time from when the washout could have reasonably been repaired until the day the State filed the complaint). Thus, the trial court assessed a total penalty of $362,185.00.
 {¶ 106} When determining the amount of the civil penalty it was assessing, the trial court concluded that the violations created "significant risks of serious environmental harm to the aquifer under the Site." Appellants argue that the trial court erred when reaching this conclusion since the flyash is "non-toxic, non-hazardous, and has a substantial number of beneficial uses as a fill and construction material" and there is no evidence of actual environmental contamination. According to Appellants, if the OEPA truly believed there was an environmental risk, then it would have tested the water and soils on and around the flyash site before filing suit against them.
 {¶ 107} Appellants' arguments in this regard are little more than frivolous attacks on the trial court's conclusions. First, the fact that the OEPA did not test the water and soil around the flyash site does not prove that it does not believe that there is a risk of harm to the environment. The OEPA does not periodically test the water and soil around a site for contamination; instead, it works on a self-reporting system. The permits issued to Tri-State require that it periodically test the ground water monitoring wells and report the results of those tests to the OEPA in the form of the MORs. Tri-State's failure to do so is one of the ways in which it violated R.C. 6111.07. And Tri-State's failure to maintain those wells in the manner described in the permits prevents OEPA personnel from being able to tell if there is any environmental contamination because of the violations. It is duplicitous for Appellants to claim that the trial court cannot impose a civil penalty because the OEPA cannot prove that there is any contamination when the civil penalty is being assessed because Appellants' failure to comply with the permits caused the OEPA's inability to prove environmental harm.
 {¶ 108} Second, the evidence at trial supports a conclusion that the flyash contains environmental contaminants that can harm drinking water even though it is described, for OEPA purposes, as non-toxic and non-hazardous. First, Appellants' own evidence defined flyash as non-toxic "where the leachate * * * does not exceed thirty times the levels" for drinking water standards set out in the Ohio Administrative Code. Thus, the fact that the OEPA describes the flyash at the site as non-toxic does not mean it is not harmful. Instead, it means that the water leaching away from the site contains less than thirty times the maximum amount of these contaminants allowed in drinking water. Defendants' Exhibit 10, a statement of OEPA policy regarding non-toxic bottom ash, flyash, and spent foundry sand, explains that the flyash is called "non-toxic" because it does not meet the federal definition of a hazardous waste and does have some beneficial uses. In addition, OEPA personnel repeatedly stated that the flyash contained contaminants that could make the groundwater undrinkable.
 {¶ 109} Appellants try to argue that the site poses no threat to the environment because there is no proof that there has been any environmental contamination from the site from "non-toxic" and "non-hazardous" material. But the evidence shows that Tri-State's failure to maintain the ground water monitoring wells is what prevents the OEPA from knowing whether there is any contamination and that the material contains environmental contaminants even if it is described as non-toxic. Accordingly, the record supports the trial court's conclusion that there is a significant risk of serious environmental harm.
 {¶ 110} The trial court also decided to assess a civil penalty due to Appellants' "recalcitrant attitude * * * to repair violations and/or monitor the Site and [their] indifference to the consequences of their action and law." Appellants contend that they could not have been recalcitrant or indifferent in closing the site since the permit only requires closure "after the ultimate storage capacity of the site has been achieved."
 {¶ 111} Appellants' argument simply fails to address the trial court's findings. The trial court did not find that Appellants were recalcitrant and indifferent because they would not close the flyash site. Instead, it found they were recalcitrant and indifferent to other duties the permits imposed upon them. Once again, Appellants have failed to demonstrate that the record does not support the trial court's conclusion that they were recalcitrant and indifferent.
 {¶ 112} The trial court further concluded that Appellants gained an economic benefit by their delayed compliance. Appellants argue that this was an abuse of discretion since there is no evidence of how much it would have cost Tri-State to comply with the permits. Without this type of evidence, Appellants believe it is impossible to tell what kind of economic benefit they gained from their delayed compliance with the permits.
 {¶ 113} Appellants' argument is correct in a certain sense. It is impossible for either the trial court or this court to calculate the precise amount of economic benefit Appellants gained by their non-compliance with the permits without the type of evidence they suggest, as well as other evidence. For instance, the OEPA's expert testified that he would need to know the cost of compliance in terms of capital cost, avoided operations of maintenance costs, cost estimate dates, compliance dates, and non-compliance dates to calculate the economic benefit someone gains from non-compliance with a permit. That type of evidence is lacking in this case.
 {¶ 114} Nevertheless, it is clear that Appellants enjoyed some economic benefit from their failure to comply with the permits. For instance, there would have been some cost involved in replacing the destroyed ground water monitoring wells and ensuring that the wastewater treatment system complied with the permits and Tri-State did not incur that cost. It would be pure speculation to state what the approximate cost of those repairs would be and, therefore, the precise amount of economic gain Appellants' received from their failure to make those repairs. Because the decision over the amount of a civil penalty is left to the informed decision of the trial court, the trial court did not abuse its discretion by considering the fact that Appellants gained some unquantifiable economic benefit from failing to comply with the permits.
 {¶ 115} In conclusion, the record supports the trial court's factual findings and it did not abuse its discretion when it assessed the civil penalty. Appellants' violations of their permits prevent anyone from knowing whether the flyash site is contaminating a productive source of drinking water. Appellants have demonstrated a recalcitrant attitude toward those in charge of enforcing the permits and an indifference to the consequences of their failure to comply with those permits. And Appellants gained some economic benefit from their failure to comply with the permits, even though the amount of that benefit cannot be determined at this time. Tri-State is a non-operational corporation worth millions of dollars and its assets have been distributed to Straub, his daughter, and his other corporations.
 {¶ 116} The trial court had the ability to fine Appellants up to $10,000 per day of violation, yet it only assessed a civil penalty of eighty-five dollars per day of violation. The trial court then mitigated that civil penalty for the reasonable length of time for the Appellants to come back into compliance after the washout. It further mitigated the civil penalty for the length of time the State took to begin litigation against them. Given these facts, the trial court's decision was not unreasonable, arbitrary, or unconscionable. Appellants' eleventh assignment of error is meritless.
 Conclusion {¶ 117} To summarize, the disqualification of the trial court is res judicata. Second, Appellants did not comply with the appellate rules sufficiently for us to address their challenge to summary judgment. Third, the correspondence between OEPA and Appellants were properly admitted and the action was not barred by waiver, estoppel or laches. Fourth, the civil penalty and closure requirements imposed by the trial court were proper as to Tri-State and Straub individually. Fifth, an appeal is not the proper vehicle to resolve whether the deed restriction imposed by the trial court is a taking. Finally, because violation of the PTI supports the penalties, the trial court's reliance on the NPDES permit was not prejudicial. Accordingly, Appellants' eleven assignments of error are meritless and the judgment of the trial court is affirmed.
Waite, P.J., Vukovich, J., concurs.