[Cite as *State ex rel. DeWine v. C&D Disposal Technologies, L.L.C.*, 2016-Ohio-5573.]

STATE OF OHIO, JEFFERSON COUNTY

IN THE COURT OF APPEALS

SEVENTH DISTRICT

| | | |
|---|---|---|
| STATE OF OHIO, EX REL. MICHAEL DeWINE, ATTORNEY GENERAL, | ) ) ) | |
| PLAINTIFFS-APPELLEES, | ) ) | CASE NO. 14 JE 0031 |
| V. | ) ) | OPINION |
| C&D DISPOSAL TECHNOLOGIES, LLC. ET AL., | ) ) ) | |
| DEFENDANTS-APPELLANT. | ) | |

CHARACTER OF PROCEEDINGS:     Civil Appeal from Court of Common
Pleas of Mahoning County, Ohio
Case Nos.: 12 CV 331, 12 CV 332

JUDGMENT:     Affirmed

APPEARANCES:
For Plaintiffs-Appellees            Attorney Elyse Akhbari
                                    Attorney Summer Koladin Plantz
                                    Attorney Robert Eubanks
                                    30 East Broad St., 25th Floor
                                    Columbus, Ohio 43215-3400

For Defendants-Appellant            Attorney Aaron Richardson
                                    4110 Sunset Boulevard
                                    Steubenville, Ohio 43952

JUDGES:

Hon. Gene Donofrio
Hon. Cheryl L. Waite
Hon. Carol Ann Robb

Dated: August 24, 2016

DONOFRIO, P.J.

{¶1} Defendant-appellant, Joseph G. Scugoza (Scugoza), appeals from a Jefferson County Common Pleas Court judgment finding that he, along with his co-defendants, violated laws regarding construction and demolition debris disposal, solid waste storage and disposal, and water pollution. The court assessed civil penalties of $4 million for overfilling a landfill and $700,000 for violating water pollution control laws. The court found all defendants, including appellant, jointly and severally liable.

{¶2} The focus of this case is a landfill located in Jefferson County (the Landfill). The Landfill was a licensed construction and demolition debris landfill from December 2004 until January 26, 2011. The Landfill encompasses a large area and includes the actual landfill site, a rail unloading area, a recycling area, a haul road to the landfill site, and an area containing scrap tires.

{¶3} Defendant C&D Disposal Technologies, LLC (C&D Disposal) operates the Landfill. Defendant Crossridge, Inc. owns the land where the Landfill is located. Defendant C&D Transportation, LLC, aka C&D Holdings, (C&D Transportation) owns 66 percent of C&D Disposal. Appellant Scugoza owns 51 percent of C&D Transportation. Appellant's mother owns the other 49 percent of C&D Transportation. The other 34 percent of C&D Disposal is owned by Martan, LLC.

{¶4} The Landfill was operated by a co-managing member of each group. Appellant was the co-manager from C&D Transportation. Diego Tantillo was the co-manager from Martan.

{¶5} On July 10, 2011, plaintiff-appellee, the State of Ohio, filed a complaint against the defendants alleging numerous violations of Ohio's environmental laws and regulations with respect to the Landfill operations. Plaintiff-appellee, the Jefferson County Health Department, filed a similar complaint. The trial court consolidated the two cases. The complaints asserted various violations including, but not limited to, operating a construction and demolition debris facility without a license since January 26, 2011, open dumping and illegal disposal of solid waste, illegally disposing of C&D construction and demolition materials, failing to properly cover combustible materials resulting in a fire, using improperly trained employees,

improperly disposing of leachate, causing leachate to reach the waters, failing to acquire storm water permits, and causing pollution of nearby waters.

{¶6} The matter proceeded to a bench trial where the court heard testimony from Scugoza and many other witnesses. The trial court then made the following findings.

{¶7} Because Scugoza owns 51 percent of C&D Holdings, which owns 66 percent of C&D Disposal, he has complete control over both companies. All EPA contracts were with Scugoza personally.

{¶8} From November 2009 through November 2011, construction and demolition debris was scattered about in Cross Creek and on the haul roads leading to the Landfill.

{¶9} From late 2009 through the first quarter of 2010, C&D Disposal operated with a deficient unloading zone. While C&D Disposal hired several "pickers" to sort through the debris and remove inappropriate items, the job was not done and a significant amount of inappropriate solid waste reached the Landfill.

{¶10} From at least October 2009, the Landfill operated without an approved leachate management system. There was a system but it relied on manual pumps when automatic pumps were called for. This resulted in leachate finding its way into Cross Creek.

{¶11} Fire protection was inadequate as fires occurred in the demolition debris that should not have.

{¶12} C&D Disposal filled the Landfill to a higher and greater slope, which illegally increased its capacity, in hopes of a variance by the EPA. As a result, the Landfill was filled 12 feet higher than permitted. This resulted in gross receipts of $4 million in excess of what was allowed.

{¶13} C&D Disposal, through Scugoza's direction, allowed 7,000 tons of scrap tires to be placed on the property for use in the construction of additional cells. Those tires, however, became solid waste and must be removed.

{¶14} In February 2012, the Jefferson County Health Department denied C&D

Disposal's landfill license. At that point, C&D Disposal had no authority to operate the Landfill, yet it continued to do so while Scugoza attempted unsuccessfully to sell the Landfill.

{¶15} C&D Disposal applied for storm water management permits but began construction before the permits were issued or exceeded the scope of the permits. As a result, excessive sediment ran off into Cross Creek and ultimately into the Ohio River.

{¶16} C&D Disposal operates a "recycling area" where demolition debris is brought in and recyclables are separated out. But the remaining solid waste is left there and is not disposed of. This area produces leachate and odor and constitutes a fire hazard. This remaining solid waste is illegally disposed of in the recycling area.

{¶17} In October 2007, C&D Disposal received a permit that required self-monitoring and record keeping of discharges. Records showed that most of the restricted parameters were exceeded most of the time resulting in several notices of violation.

{¶18} On November 30, 2012, C&D Disposal's permit expired and was never renewed even though the permit is required until the Landfill is completely closed and capped.

{¶19} Based on these findings, the trial court concluded that Scugoza was directly liable for his personal involvement and the exercise of his authority. The court found Scugoza directed the conduct that caused the violations. The court found the defendants violated numerous provisions of the Ohio Revised Code and the Ohio Administrative Code. For the construction and demolition debris violations, the court assessed a civil penalty of $4 million, the amount of the economic benefit realized by the defendants for the violation of Ohio law. For the violation of Ohio's water pollution control statute, the court assessed a penalty of $50 per day of violation (with 14,000 days of violation) for a total of $700,000. Finally, the court ordered significant injunctive relief including removing solid waste and properly closing the Landfill.

{¶20} Appellant filed a timely notice of appeal on August 29, 2014. He is the only defendant who appealed the trial court's judgment. Appellant now raises four assignments of error.

{¶21} Appellant's first assignment of error states:

THE TRIAL COURT'S DECISION DETERMINING THE AMOUNT OF THE CIVIL PENALTY FOR VIOLATIONS OF SOLID WASTE AND CONSTRUCTION AND DEMOLITION DEBRIS LAWS WAS ARBITRARY, UNREASONABLE, AND UNCONSCIONABLE.

{¶22} Appellant argues that the trial court arbitrarily imposed a $4 million dollar civil penalty in this case. He points out the court found that the Landfill was overfilled by nearly 12 feet, which generated about $4 million for defendants. He notes that the court then found the appropriate civil penalty to be the amount of economic benefit realized by the defendants by their violation of the law. Appellant asserts the trial court was required to, and failed to, address the factors set out in *State v. Tri-State Group, Inc.*, 7th Dist. No. 03 BE 61, 2004-Ohio-4441, for determining the appropriate amount of a civil penalty.

{¶23} Appellant further argues the court failed to address whether any mitigating factors applied, such as the sum to reflect any part of the non-compliance attributable to the government or the sum to reflect any part of the non-compliance caused by factors outside of the violator's control. He also contends the court erred in failing to consider his financial situation.

{¶24} Moreover, appellant argues the court erred in relying on the testimony of appellees' witness, Craig Walkenspaw, who testified regarding the volume of the Landfill. He asserts Walkenspaw did not give any basis for how he arrived at his figures. And he asserts that using Walkenspaw's figures, the amount of gross receipts equals $3,910,400, not $4 million.

{¶25} In assessing a civil penalty for violations of Ohio's environmental statutes, as long as the amount assessed is less than the statutory maximum, it is

within the trial court's discretion to set the amount. *State, ex rel. Brown v. Dayton Malleable, Inc.*, 1 Ohio St.3d 151, 157, 438 N.E.2d 120 (1982). We will only reverse the trial court's decision regarding the amount of the civil penalty if it is unreasonable, arbitrary, or unconscionable. *State v. Tri-State Group, Inc.*, 7th Dist. No. 03 BE 61, 2004-Ohio-4441, ¶ 103.

{¶26} In determining the amount of the civil penalty, the trial court should consider several factors: (1) the harm or threat of harm posed to the environment by the violator; (2) the level of recalcitrance, defiance, or indifference demonstrated by the violator of the law; (3) the economic benefit gained by the violation; and, (4) the extraordinary costs incurred in enforcement. *Tri-State Group, Inc.*, 2004-Ohio-4441, at ¶ 104. Appellant claims the trial court erred by failing to address these factors.

{¶27} The court, however, did address the *Tri-State* factors. The court listed the four factors in its Judgment Entry, citing *Tri-State*. (Judgment Entry, ¶ 99). The court found that as a result of overfilling the Landfill, the defendants received an economic benefit of $4 million in gross receipts. (Judgment Entry, ¶ 100). This finding goes to the third factor regarding the economic benefit gained by the violation. The court further found that the defendants allowed the filling in excess of the amounts authorized by the Landfill's license and noted this amount of material should not have been accepted at the Landfill. (Judgment Entry, ¶ 100). These findings relate to the second factor regarding the defendants' recalcitrance, defiance or indifference.

{¶28} Additionally, in its findings of fact, the trial court detailed the harm and threat of harm to the environment, thereby considering the first factor. The court found that fire protection at the Landfill was inadequate and, consequently, fires occurred that should not have occurred. (Judgment Entry, ¶ 12). The court also found that through appellant's direction, C&D Disposal allowed 7,000 tons of scrap tires to be placed on the property, which have now become solid waste. (Judgment Entry, ¶ 14). And the court found that C&D Disposal operates a "recycling area" where recyclables are separated from waste and sold. (Judgment Entry, ¶ 17). The

problem with the recycling area, the court found, was that the solid waste remained and accumulated in a non-engineered facility exposed to the elements, which produces leachate and odor, attracts rodents, and constitutes a fire hazard. (Judgment Entry, ¶ 18).

{¶29} Thus, the only *Tri-State* factor the court did not specifically address was the fourth factor dealing with the extraordinary costs incurred in enforcement. This is likely because the state did not put forth any evidence of the actual costs it incurred in enforcement. Therefore, the court could not make a finding regarding this factor.

{¶30} Appellant also asserts the trial court failed to consider mitigating factors, including his financial situation.

{¶31} The trial court noted that it could consider two mitigating factors when calculating a civil penalty: (1) the sum, if any to reflect any part of the noncompliance attributable to the government, and (2) the sum appropriate to reflect any part of the noncompliance caused by factors completely beyond the violator's control. (Judgment Entry, ¶ 99, citing *State ex rel. Brown v. Dayton Malleable, Inc.*, 2d Dist. No. 6722, 1981 WL 2776, *4 (Apr. 21, 1981), reversed on other grounds by *State, ex rel. Brown v. Dayton Malleable*, *Inc.*, 1 Ohio St.3d 151, 438 N.E.2d 120 (1982)). The court also stated that it could consider the financial status of the defendant when setting a civil penalty. (Judgement Entry, ¶ 109, citing *State ex rel. Petro v. Mauer Mobile Homes Court, Inc.*, 6th Dist. No. WD-06-053, 2007-Ohio-2262, ¶ 62). Thus, the trial court made clear that it was cognizant of several mitigating factors.

{¶32} Appellant asserts the court did not allow him to introduce evidence of his financial situation. In support, he points to part of his testimony where he stated he "just went broke" from putting money into fixing things. (Tr. 289). The court stated, "I understand. He says he's broke. Let's move on." (Tr. 289). Appellant's counsel then stated he was going to ask him several questions about that. (Tr. 289). The court did not take issue with counsel's statement, but counsel never did ask further questions on the subject. Thus, the court did not stop appellant from introducing evidence as to his financial situation as he suggests.

**{¶33}** The last issue appellant raises in this assignment of error deals with Craig Walkenspaw's testimony. Walkenspaw is the District Engineer in the Division of Material and Waste Management for the Ohio EPA.

**{¶34}** Walkenspaw testified that the maximum slope permitted by law for a construction and demolition debris landfill, absent a variance from the Ohio EPA, is 4:1. (Tr. 78). Walkenspaw then referred to a drawing of the topography of the amassed waste at the Landfill. (Tr. 91-92). The drawing was prepared by C&D Disposal's consultant. (Tr. 92). It showed the northern slope was 2.6:1 and another slope was 2:1. (Tr. 92). Both of these slopes were greater than the permitted 4:1 slope. (Tr. 92). Walkenspaw further testified the highest depth of overfill at the Landfill was 28 feet and the average depth of overfill was 11.9 feet. (Tr. 96). From these numbers and observing the Landfill, Walkenspaw was able to determine that, on average, the Landfill was overfilled by 26,000 acres per yard. (Tr. 106). This equaled 626,000 cubic yards of overfill. (Tr. 107). Walkenspaw concluded this overfill resulted in excess of $4 million worth of extra material that the Landfill was able to accept. (Tr. 107).

**{¶35}** Walkenspaw also testified that the $4 million amount did not include the waste that was placed in the recycling area. (Tr. 108-109). He stated that would have resulted in $320,000 of additional gross revenue. (Tr. 109).

**{¶36}** Appellant contends the court should not have relied on Walkenspaw's figures because he did not provide the basis for them. But Walkenspaw testified that he relied on drawings done by appellant's consultant in arriving at his figures. Additionally, appellant contends, using Walkenspaw's figures, the amount of gross receipts equaled $3,910,400, not $4 million. While that may be true for the actual landfill, it does not take into consideration the additional $320,000 of gross revenue Walkenspaw testified was attributable to the waste placed in the recycling area. This would have brought the total to $4,230,400. Thus, even assuming appellant is correct and the $4 million figure should have been $3,910,4000, the court could still have added the $320,000 in gross revenue attributable to waste that should not have

been dumped in the recycle area, which would bring the total to over $4 million.

{¶37} Based on the above, we cannot conclude that the trial court abused its discretion in assessing the civil penalty. Accordingly, appellant's first assignment of error is without merit.

{¶38} Appellant's second assignment of error states:

THE TRIAL COURT ERRED WHEN IT DETERMINED THAT DEFENDANTS WERE IN VIOLATION OF OHIO REVISED CODE §6110.09 FOR OVER FOURTEEN THOUSAND DAYS.

{¶39} The trial court found that the defendants were in violation of various provisions of Ohio's water pollution control statute for 14,000 days. The court assessed a penalty of $50 per day for each of these violations for a total civil penalty of $700,000 for the violations of the water pollution control statute.

{¶40} Here appellant does not challenge the $50 per day amount. But he asserts the calculation of 14,000 days was in error. Appellant points out that the state asserted the defendants committed multiple violations on a daily basis and counted each violation as a separate day of violations resulting in 14,000 days of violations, or 38 years of violations.

{¶41} Appellant points out that the first notice of violation regarding water pollution was sent to appellants in November 2009. From that time to the date of the hearing, appellant asserts, 1,460 days passed. Thus, appellant argues, the court charged it ten days of violation for every one actual day of violation. He claims R.C. 6110.09 only allows for a civil penalty for each day of violation. Therefore, appellant urges that the correct civil penalty is $73,000 ($50 per day x 1,460 days of violation).

{¶42} R.C. 6111.09(A) provides that "[a]ny person who violates section 6111.07 of the Revised Code shall pay a civil penalty of not more than ten thousand dollars per day of violation." Because R.C. 6111.09(A) orders a mandatory penalty, a trial court has no discretion as to whether to impose a civil penalty. *Tri-State Group, Inc.*, 2004-Ohio-4441, ¶ 103. But the language of the statute gives the trial court

broad discretion to determine the amount of that penalty. *Id.*, citing *State ex rel. Brown v. Dayton Malleable*, 1 Ohio St.3d 151, 157, 438 N.E.2d 120 (1982).

**{¶43}** The trial court found the defendants in violation of numerous provisions of the water pollution laws including water pollution, discharge of pollutants to waters of the state, failing to keep waters free from suspended solids or other substances, conducting activities without a storm water permit, failing to comply with a storm water permit, and failing to obtain coverage under the general storm water permit for the recycling area. The court found the evidence demonstrated the defendants were in violation of various provisions of the water pollution control statute for over 14,000 days. The court noted that the statute provides for a civil penalty of up to $10,000 per day of violation. It noted that the maximum penalty then would be $140,000,000.

**{¶44}** The court went on to point out that the state had not requested the maximum penalty. Instead, the state requested a penalty of $50 per day for each violation, which totaled $700,000. The court noted that the violations were presumably continuing to this day even though their calculation had stopped. The court agreed with the state that the maximum penalty was not warranted in this case. It further agreed that $50 per day for each day of violation was appropriate. Therefore, it assessed a civil penalty of $700,000.

**{¶45}** The court calculated the total civil penalty based on the multiple violations of the water pollution laws appellants committed each day. It used the number of violations as justification for the total civil penalty. The court acted within its discretion in calculating the total civil penalty in this manner. It took into consideration the numerous violations, the large number of days involved, and the fact that the violations were ongoing and likely continued to this day.

**{¶46}** Accordingly, appellant's second assignment of error is without merit.

**{¶47}** Appellant's third assignment of error states:

THE TRIAL COURT ERRED IN HOLDING APPELLANT SCUGOZA PERSONALLY LIABLE FOR THE VIOLATIONS COMMITTED BY C&D DISPOSAL TECHNOLOGIES, LLC. USING

THE "PERSONAL PARTICIPATION THEORY."

**{¶48}** The trial court found that appellant was personally liable under the "personal participation" theory.

**{¶49}** In this assignment of error, appellant argues the court erred in holding him personally liable. Appellant argues that the court applied the wrong test. He asserts the court should have applied the three-part test set out in *Belvedere Condominium Unit Owners' Assn. v. R.E. Roark Cos., Inc.*, 67 Ohio St.3d 274, 617 N.E.2d 1075 (1993) holding modified by *Dombroski v. WellPoint, Inc.*, 119 Ohio St.3d 506, 2008-Ohio-4827, 895 N.E.2d 538, for piercing the corporate veil.[1] Appellant claims that had the court applied this test, it would have found that it should not hold him personally liable for the acts of his businesses.

**{¶50}** Appellant notes that as the representative of C&D Transportation in the operation of C&D Disposal, he controlled 66 percent of C&D Disposal's stock. But appellant states that a 73 percent supermajority was required for all business decisions. Moreover, he notes there was no evidence that he held himself out as personally liable for corporate obligations. Appellant admits that he was C&D Disposal's manager and had some control over daily operations, but argues that without control over spending or the ability to single-handedly make business decisions, the company operated separately from him.

**{¶51}** As to appellant's personal liability, the trial court found:

> Scugoza's liability is not vicarious for being an owner or officer of C&D. Rather, his liability is direct for his personal involvement and

---

1 The test set out in *Belvedere* is:

The corporate form may be disregarded and individual shareholders held liable for wrongs committed by the corporation when (1) control over the corporation by those to be held liable was so complete that the corporation has no separate mind, will, or existence of its own, (2) control over the corporation by those to be held liable was exercised in such a manner as to commit fraud or an illegal act against the person seeking to disregard the corporate entity, and (3) injury or unjust loss resulted to the plaintiff from such control and wrong.

*Id.* at paragraph three of the syllabus.

action in the actual exercise of his authority. [Footnote omitted.] It is not that he had authority but rather that he actually exercised it in directing the conduct that caused the violations. For example (without limitation) it was Scugoza who decided to remain open while in violation and to fill to greater than a 4-1 slope and to operate with manual rather than automatic leachate pumps. His liability arises not from his ability to make these decisions but because he actually did so.

(Emphasis sic.; JE, ¶ 69).

**{¶52}** This court recently addressed the propriety of the trial court's decision to impose personal liability on the owner of several companies that committed environmental violations during asbestos removal in a mill owned by one of his companies. In *State ex rel. DeWine v. Sugar*, 7th Dist. No. 14 JE 0004, 2016-Ohio-884, the trial court held Sugar personally liable based on his personal conduct. The trial court emphasized that throughout the ordeal, the EPA contacted Sugar personally on multiple occasions. *Id.* at ¶ 34. It further pointed out that Sugar was repeatedly informed of the violations as the sole person in charge. *Id.* And the trial court stressed: "*Whatever was done was on his order, whatever was not done was on his failure to order. He alone had authority to control activity on the site.* (Emphasis added.)" *Id.* Sugar appealed.

**{¶53}** On appeal, this court cited to *DeWine v. Deer Lake Mobile Park*, 11th Dist. No. 2013-G3156, 2015-Ohio-1060, 29, 29 N.E.3d 35 N.E.3d 35, where the Eleventh District reviewed personal liability based on the personal participation theory in a case involving violations of the clean water regulations. The trial court in that case found the manager of a mobile park personally liable for the violations. *Sugar*, at ¶ 35, citing *DeWine,* at ¶ 57. The appellate court affirmed the penalty finding that the manager's individual participation established his personal liability. *Id.* The court relied on certain facts to establish the manager's personal liability: he supervised the park, he managed the budget and records, he oversaw the operations of the facility, he served as the administrative contact person, and he failed to correct known

violations even though he had the authority to do so. *Id.*

{¶54} We then went on to find a myriad of evidence established Sugar's personal liability. For instance, Sugar oversaw operations, organized the project, sent workers from his companies, served as the administrative contact person, received and responded to all notices of violations, gave all of the orders regarding the project, ordered his agent to visit the site to handle problems when they arose, and ordered his workers to prevent inspectors from entering the site. *Id.* at ¶ 36. We found most important that Sugar made all of the decisions. *Id.* at ¶ 37. We also found significant that Sugar failed to correct known violations despite the fact that he was the sole person who had the authority to correct the violations. *Id.* at ¶ 38. Based on the above, we concluded the trial court did not err in finding Sugar personally liable as an individual based on the personal participation theory. *Id.* at ¶ 41.

{¶55} Neither *Sugar* nor *DeWine* applied the three-part test set out in *Belvedere*, 67 Ohio St.3d 274, for piercing the corporate veil. Both this court and the Eleventh District affirmed the use by the trial courts of the personal participation theory. And both of those cases dealt with imposing civil penalties for violations of environmental laws on the owners of the companies that committed the violations. Likewise, the trial court applied the appropriate test in this case.

{¶56} Accordingly, appellant's third assignment of error is without merit.

{¶57} Appellant's fourth assignment of error states:

THE TRIAL COURT ACTED IMPROPERLY WHEN IT NOTIFIED THE PARTIES THAT THE HEARING MUST BE COMPLETED IN ONE DAY, AND REFUSED TO ALLOW APPELLANT SCUGOZA TO PUT FORTH MITIGATING EVIDENCE OF HIS ABILITY TO PAY A CIVIL PENALTY.

{¶58} In his final assignment of error, appellant contends the trial court prevented him from putting on his whole defense. He makes several arguments in

support.

**{¶59}** First, appellant takes issue with the trial court's statement that it wanted to complete this case in one day. (Tr. 6).

**{¶60}** The trial court's statement that it wanted to complete the case in a day was not unreasonable. Courts frequently make similar statements in trying to maintain their docket and move cases along.

**{¶61}** Second, appellant points out that the court told his counsel that it would only permit him to call appellant to the stand one time, instead of clarifying issues from cross-examination and reserving direct examination until his case-in-chief. (Tr. 70).

**{¶62}** The state called appellant as its first witness. At the conclusion of direct examination, the court inquired of appellant's counsel if he wanted to question appellant at that time. (Tr. 69). Counsel indicated he would like to clear up a few areas appellant had just testified to and then reserve the opportunity to conduct his direct examination later. (Tr. 69). The court told appellant's counsel, "You get one crack at it, and you can have it now or you can have it later. You pick, but he's going to testify once." (Tr. 69-70). Counsel chose to wait to question appellant.

**{¶63}** The trial court could have permitted appellant's counsel to briefly question appellant after the state called him as its witness and then call him again later to testify in his defense. But this was not a jury trial where testimony could have had more of an impact if the triers of fact heard testimony to clear issues up right away. And appellant's counsel still had a full opportunity to question him. Thus, there is no prejudicial error here.

**{¶64}** Third, appellant cites to several instances in the transcript where the court inquired of the parties as to how long each witness was going to be. (Tr. 139, 140, 196, 244, 254). Appellant claims these time inquires, coupled with "the Court's demeanor" during his case-in-chief forced him to shorten his defense and detrimentally impacted his case. (Tr. 275, 280, 289).

**{¶65}** The instances appellant refers us to where the court inquired of the

parties as to how long particular witnesses would be, are just that – the court inquiring as to how long particular witnesses would be. There is nothing to suggest that the court was somehow cutting the witnesses short or preventing appellant from presenting his case. For instance, one exchange was as follows:

> THE COURT: How many more witnesses do you have?
> MR. EUBANKS [counsel for the State of Ohio]: I have Dale Warner. And I will probably call Carla Gampolo briefly.
> THE COURT: So how much longer testimony time do you think you have left?
> MR. EUBANKS: Oh, I'm sorry, your Honor. I have one.
> THE COURT: You have what?
> MR. EUBANKS: I have one. I'm assuming Emanuela will call Carla, so I'll just ask her questions then, but I forgot Summer has three witnesses.
> THE COURT: Okay. Timewise, what do you think that is?

(Tr. 139-140).

{¶66} Moreover, during the instances appellant cites to, the court is inquiring of the appellees' attorneys as to how long they will be. (Tr. 139, 140, 196, 244, 254). Thus, it is hard to see how this could have affected appellant.

{¶67} As to the instances where appellant asserts the court's "demeanor" forced him to shorten his defense, it seems the court simply wanted to move the trial along so that it could be completed. It made comments like, "Let's get moving" and "Let's just get to whether or not there is any violations." (Tr. 275, 280). The court may have appeared slightly impatient but there is no indication that appellant did not get to present all of his relevant evidence.

{¶68} Accordingly, appellant's fourth assignment of error is without merit.

{¶69} For the reasons stated above, the trial court's judgment is hereby

affirmed.

Waite, J., concurs.

Robb, J., concurs.