OPINION *Page 2 
{¶ 1} Defendant-appellants Meadowlake Corporation and Meadowlake Limited, LLC appeal from the August 4, 2006, Judgment Entry of the Stark County Court of Common Pleas.
 STATEMENT OF THE FACTS AND CASE {¶ 2} Meadowlake Golf and Swim Club consists of a golf course, a swimming pool, a pro shop, a restaurant, a snack shop and a banquet facility. Prior to the construction of the golf course, which started in 1963 as a nine hole course, the Barr family operated a dairy farm on the subject property. The dairy barn was converted into a clubhouse.
 {¶ 3} Currently, Meadowlake Golf and Swim Club is operated by appellant Meadowlake, Ltd., which came into legal existence in 2001, whereas appellant Meadowlake Corporation owns the land on which the club and golf course are located. Roy Barr is the Chief Executive Officer of both Meadowlake Corporation and Meadowlake Ltd. A well located in the basement of the farmhouse supplies water to the farmhouse, the pool house, and the club house.
 {¶ 4} In approximately 1995, the Ohio Environmental Protection Agency ("Ohio EPA") determined that appellant Meadowlake Corporation owned and operated a "public water system" on the subject property and, therefore, was required to obtain an operational license from the Ohio EPA. Appellant Meadowlake Corporation obtained licenses to operate a public water system on the subject property in 1996 through 1998. However, neither appellant Meadowlake Corporation nor Meadowlake Ltd., have applied for or been granted such a license since such time. *Page 3 
 {¶ 5} Thereafter, in August of 1999, the Director of the Ohio EPA issued a proposed action designating the public water system on appellants' property as a source of water "under the influence of surface water." Prior to such time, the well source classification had been "Ground Water." The Ohio EPA, via a letter issued on August 11, 1999, with an effective date of September 27, 1999, designated the water source at Meadowlake Golf Swim Club as a surface water source. As a result of such designation, the monitoring and treatment requirements for the water system changed. Whereas, prior to such designation, Meadowlake Golf Swim Club had to provide one bacteria sample per quarter and a nitrate sample once a year, after such designation, Meadowlake Golf Swim Club was required to provide four bacteria samples a month and a nitrate sample every month. In addition, the letter sent to Meadowlake Golf and Swim Club advised appellants that they had 18 months, or until April of 2001, to exercise one of five options to bring the public water system at the Meadowlake property into compliance. The five options were as follows:
 {¶ 6} "a. installation of approved filtration treatment and disinfection which complies with OAC Rule 3745-81-73;
 {¶ 7} "b. eliminating the construction and isolation defects of your existing well(s) so that it (they) may be re-evaluated and redesignated as ground water;
 {¶ 8} "c. abandonment of those wells designated as surface water and installation of adequate approved ground water sources;
 {¶ 9} "d. abandonment of your surface water source(s) and installation of an approved hauled water system; or *Page 4 
 {¶ 10} "e. abandonment of your surface water source(s) and purchasing water from an approved public water system."
 {¶ 11} From November of 1999 on, the Ohio EPA sent numerous letters to Ray Barr of Meadowlake Golf and Swim Club advising him that Meadowlake's public water system was in violation of the Ohio Administrative Code.
 {¶ 12} On or about February 23, 2001, the Ohio EPA sent Meadowlake Golf and Swim Club a warning letter stating that, by March 27, 2001, it was required to make changes in its system and "receive a ground water designation for your sources or install surface water treatment."
 {¶ 13} On or about May 7, 2002, the Director of the Ohio EPA issued a document captioned "Director's Unilateral Administrative Findings and Orders" to Roy Barr, as owner of Meadowlake Golf Swim Club, stating, in relevant part, as follows:
 {¶ 14} "I am writing with regard to the violations of Ohio's safe drinking water rules at the Meadowlake Golf Swim's public water system. Specifically, you have failed to comply with source water designation requirements, failed to install filtration treatment, failed to monitor for total coliform bacteria and nitrate, failed to prepare and maintain a written sample siting plan, failed to issue public notices, and operated a public water system without a license. These violations present a serious health risk to Meadowlake Golf Swim's consumers."
 {¶ 15} In response, Roy Barr filed a Notice of Appeal challenging the "Director's Unilateral Administrative Findings and Orders". The Director revoked his unilateral findings and orders on September 23, 2003 and Roy Barr's pending appeal was dismissed. *Page 5 
 {¶ 16} Subsequently, on May 19, 2004, the State of Ohio filed a complaint against appellants alleging that they owned and operated a public water system and were in violation of Chapters 6109 and 6111 of the Ohio Revised Code and regulations adopted thereunder for failing to maintain a public water license, failing to maintain a written sample siting plan, and failing to sample the water adequately for both nitrates and bacteria. The State of Ohio further alleged that appellants had failed to notify the public of the violations and had violated water well standards. The State of Ohio, in its complaint, sought both injunctive relief and a civil penalty of $25,000.00 a day for each day there has been a violation. The State of Ohio specifically sought to enjoin appellants to achieve compliance with water well standards and with regulations concerning surface water. The State of Ohio also sought to enjoin appellants to obtain and maintain a license to operate a public water system, among other matters.
 {¶ 17} On July 19, 2004, Roy E. Barr, as Trustee of the Roy E. Barr Living Trust, filed a motion to intervene as a defendant. Barr, in his motion, indicated that he was the sole owner of appellant Meadowlake Corporation and, in his individual capacity, owned 99% of appellant Meadowlake, Ltd. The trial court granted such motion pursuant to a Judgment Entry filed on September 2, 2004.
 {¶ 18} The trial court, over the State's objection, bifurcated the case and, on January 9, 2006, a jury trial commenced on the sole issue of whether appellants owned or operated a public water system. However, the trial court declared a mistrial, finding, in a "Declaration of Mistrial" filed on January 13, 2006, that the "inappropriate and extra-issue scope of the comments of Roy Barr prejudiced the jury to such an extent that `the ends of public justice' could not be attained in this matter without discontinuing the trial." *Page 6 
 {¶ 19} An Assignment Notice was filed on March 9, 2006, setting the matter for a new jury trial on May 30, 2006. On the same day, appellants' counsel filed a motion for leave to withdraw as counsel for appellants, indicating that appellants had failed to make any payments on their account since mid-January and had "failed to make any satisfactory provisions for payment of their substantial account balance . . . despite written and oral requests to do so." Roy E. Barr, in a letter to the trial court dated March 10, 2006, and filed on March 14, 2006, indicated that appellants' counsel's employment was terminated on the day such counsel had filed the motion to withdraw. On the same day, appellants, through Ray E. Barr, filed a response indicating that they had no objection to their counsel's request to withdraw. Appellants, in their response, indicated that Roy E. Barr was out of the state during the winter months for health reasons and that they would retain a new attorney once he returned to Ohio on April 20, 2006. Appellants' counsel, on March 20, 2006, filed a Notice of Withdrawal as counsel.
 {¶ 20} As memorialized in an Order file on March 23, 2006, the trial court granted the Motion for Leave to Withdraw as counsel. The trial court, in its order, noted that appellants, as corporate entities, could not proceed in court without being represented by counsel. The trial court, in its Order, further stated, in relevant part, as follows:
 {¶ 21} "Therefore, the Defendants are ordered to immediately secure the representation of other counsel in order to proceed in this matter, or if they choose to waive the representation of counsel to understand that any non-attorney even though an officer of any of the Defendant corporations or an appointed agent of any of the Defendant corporations could not file pleadings, present further defense regarding the issue before the court, or otherwise represent the interests of the corporate defendants." *Page 7 
 {¶ 22} On May 16, 2006, the State of Ohio filed a motion asking the trial court to reconsider it decision allowing the jury to hear any part of the case. The State of Ohio, in its motion, indicated, in part, that appellants did not have a right to a jury trial on any issue in the case sub judice under either common law or under the statute under which the action had been brought. The trial court, pursuant to an Order filed on May 19, 2006, sustained such motion and ordered that a bench trial be held on May 30, 2006.
 {¶ 23} At the trial on May 30, 2006, appellants, who were not represented by counsel, were not permitted to cross-examine the witnesses, offer evidence, make objections, or in any way participate or defend themselves. At the conclusion of the trial, the trial court took the matter under advisement and asked the State of Ohio to submit written findings of fact and conclusions of law.
 {¶ 24} Subsequently, on July 11, 2006, appellants, who had since secured counsel, filed a Motion for an Evidentiary Hearing. Appellants, in their motion, asked for an order permitting them to present evidence prior to the required post trial briefing. Appellants argued that, "due to the short timeframe and the complex environmental nature of the subject matter", they had been unable to retain replacement counsel in time for the May 30, 2006, trial. The trial court, as memorialized in a Judgment file on August 1, 2006, overruled such motion, stating, in relevant part, as follows:
 {¶ 25} "Being advised in the premises, the motion and briefs of counsel, the court does not find the Defendants' motion well taken and overrules the same. The Defendants, having been advised of the consequences of their failure to hire new counsel to appear at the May 30, 2006 trial delayed such hiring themselves. The attorney, whom the Defendants state was unavailable to appear at the trial due to *Page 8 
serious personal injuries, had never entered an appearance in this matter and was never counsel of record in the action. Prejudice to the Defendants, if any, was caused by their own acts. The Defendants here, in fact, are requesting a post-trial continuance of the matter."
 {¶ 26} Thereafter, pursuant to a Judgment Entry filed on August 4, 2006, the trial court found that appellant "Meadowlake Corporation and/or [appellant] Meadowlake Ltd. own(s) and/or operate(s) a `public water system' as such term is defined in R.C. 6109.01(A) and Ohio Administrative Code (O.A.C.) 3745-81-01 (FFF)." The trial court further found that appellant Meadowlake Corporation and/or appellant Meadowlake Ltd had violated R.C. Chapter 6109 and rules adopted under the authority of the same and/or orders issued by the Ohio EPA by, among other matters, operating without a public water system license and failing to collect total coliform routine samples and monitor for the presence of coliform bacteria once each calendar year. The trial court ordered appellants Meadowlake Corporation and Meadowlake Ltd., jointly and severally, to pay $300,000.00 in civil penalties and also granted the injunctive relief requested by the State of Ohio. The trial court, it its entry, found that such appellants had committed more than 1,000 intentional violations of R.C. Chapter 6109. The trial court ordered appellants to obtain a public water system license, to comply with surface water treatment rules and water well standards, and to monitor the water supply, among other matters.
 {¶ 27} Appellants now raise the following assignments of error on appeal: *Page 9 
 {¶ 28} "I. THE TRIAL COURT ERRED BY PROCEEDING TO TRIAL ON MAY 30, 2006, WITH THE KNOWLEDGE THAT MEADOWLAKE DEFENDANTS WERE UNREPRESENTED BY COUNSEL FOR REASONS BEYOND THEIR CONTROL.
 {¶ 29} "II. THE TRIAL COURT ERRED BY DENYING APPELLANTS' MOTION FOR EVIDENTIARY HEARING THEREBY DENYING APPELLANTS THE OPPORTUNITY TO PROFFER EVIDENCE, CROSS EXAMINE WITNESSES, PRESERVE ERRORS, OR OTHERWISE DEFEND THEIR POSITION.
 {¶ 30} "III. THE TRIAL COURT ERRED BY DENYING APPELLANT'S DEMAND FOR JURY TRIAL.
 {¶ 31} "IV. THE PENALTIES THAT THE TRIAL COURT AWARDED TO THE OHIO EPA ARE EXCESSIVE, ARBITRARY, INAPPROPRIATE, AND IN VIOLATION OF APPELLANTS' DUE PROCESS RIGHTS."
 I {¶ 32} Appellants, in their first assignment of error, argue that the trial court erred by proceeding to trial on May 30, 2006, when it knew that appellants were unrepresented by counsel "for reasons beyond their control." We disagree.
 {¶ 33} As an initial matter, we note that appellants never filed a written motion for a continuance of the May 30, 2006, trial. However, appellants now argue that the trial court should not have proceeded with the trial when they did not have sufficient time to retain substitute counsel after their former counsel withdrew. Appellants note that, in the spring of 2006, they contacted D. Patrick DeBoer, who had served as appellants' counsel in corporate matters, to represent them in the case sub judice and that because *Page 10 
DeBoer was involved in a skiing accident on or about April 18, 2006, he was unable to represent appellant in the trial scheduled for May 30, 2006.
 {¶ 34} As is stated above, appellants' first trial was declared a mistrial due to the behavior of Roy E. Barr. On March 9, 2006, the same day that a notice was issued setting a new trial date of May 30, 2006, appellants' counsel filed a motion to withdraw on the basis that appellants had not only failed to make any payments on their substantial account balance but also "failed to make any satisfactory provisions for payment of their substantial account balance . . . despite written and oral requests to do so." At such point in time, the trial was approximately eighty (80) days away. While appellants now contend that they did not know that they could oppose the motion to withdraw, in a pro se response filed on March 14, 2006, they stated that they did not object to their counsel's withdrawal and that they would retain new counsel once Roy E. Barr returned to Ohio on April 20, 2006.
 {¶ 35} The trial court, in its March 23, 2006, order, which was sent to all appellants, advised appellants that they needed to immediately secure counsel because corporate entities, by law, can only be represented by an attorney. However, as noted by the trial court in its August 4, 2006, Judgment Entry, no counsel ever entered an appearance on appellants' behalf or requested a stay of the proceedings.
 {¶ 36} Based on the foregoing, we find that, contrary to appellants' argument, appellants' lack of counsel was not due to extenuating circumstances beyond their control. As noted by appellee, appellants' deliberate actions led to the withdrawal of their former attorney. While appellant had approximately eighty (80) days to secure *Page 11 
new counsel, they failed to do so. We find, therefore, that the trial court did not err by proceeding to trial when it knew that appellants were unrepresented by counsel.
 {¶ 37} Appellants' first assignment of error is, therefore, overruled.
 II {¶ 38} Appellant, in their second assignment of error, argue that the trial court erred in denying their July 11, 2006, Motion for an Evidentiary Hearing. We disagree.
 {¶ 39} As is stated above, after the May 30, 2006, trial in this matter but before the trial court issued its decision, appellants, on July 11, 2006, through newly retained counsel, filed a motion requesting an order permitting appellants "to present evidence prior to the required post trial briefing in this matter . . . to permit [appellants] an opportunity to present evidence in this matter as the same opportunity was not available at trial due to circumstances beyond [appellants'] control." The trial court overruled such motion noting, in part, that appellants were, in fact, requesting a post-trial continuance. Appellants now maintain that they were denied their due process rights[1] to introduce evidence and cross-examine witnesses.
 {¶ 40} As is discussed above with respect to appellants' first assignment of error, we find that the withdrawal of appellants' original attorney and their failure to retain new counsel were not "circumstances beyond [appellants'] control". Appellants' own actions, rather than the actions of the trial court, resulted in their non-representation by counsel *Page 12 
at trial. Based on the facts, it would be patently unfair to allow appellants to, in effect, participate in the trial by submitting evidence after the fact.
 {¶ 41} Appellants' second assignment of error is, therefore, overruled.
 III {¶ 42} Appellants, in their third assignment of error, contend that the trial court erred in denying their demand for a jury trial. We disagree.
 {¶ 43} Pursuant to Section 5, Article I of the Ohio Constitution, "[t]he right of trial by jury shall be inviolate [.] However, as noted by the Ohio Supreme Court in Arrington v. DaimlerChrysler Corp.,109 Ohio St.3d 539, 2006-Ohio-3257, 849 N.E.2d 1004, "[t]he right to a jury trial is not, however, absolute. The Constitution does not entitle all civil litigants to a trial by jury. Instead, it preserves the right only for those civil cases in which the right existed before the adoption of the constitutional provision providing the right." Id at paragraph 22.
 {¶ 44} Pursuant to Article I, Section 5, of the Ohio Constitution and Section 2311.04 of the Ohio Revised Code, a demand for a money judgment usually entitles a plaintiff to a jury trial. However, a plaintiff has no right to a jury trial, however, for the resolution of equitable claims, and a trial court may itself resolve those claims. Ohio Bd. ofDietetics v. Brown (1993), 83 Ohio App.3d 242, 247, 614 N.E.2d 855. In an action seeking an injunction, there is no right to a jury trial because such an action is equitable in nature. See State ex rel. Millerv. Anthony, 72 Ohio St.3d 132, 1995-Ohio-39, 647 N.E.2d 1368. When a case presents both a legal and equitable claim for relief, and the money demand is "incidental and ancillary" to the equitable claim and can be awarded only if the equitable relief is granted first, then the case is predominantly an equitable *Page 13 
action, for which no jury trial is required. Murello Constr. Co. v.Citizens Home Savings Co. (1985), 29 Ohio App.3d 333, 334,505 N.E.2d 637 (holding that a jury trial was not required when the money demand, although specific, was "incidental and ancillary" to the equitable relief requested and would ripen only if equitable relief were granted);, citing Pyromatics, Inc. v. Petruziello (1983),7 Ohio App.3d 131, 134, 454 N.E.2d 588.
 {¶ 45} In the case sub judice, a right to a jury trial did not exist upon this type of action prior to the adoption of the Ohio Constitution of 1802. Actions for the enforcement of water pollution control laws under R.C. Chapter 6109 did not exist at common law. See, for example,State of Ohio ex rel., Betty Montgomery v. Portage Landfill andDevelopment Co. (June 30, 1999), Portage App. No. 98-P-0033,1999 WL 454623, concerning R.C. Chapter 6111.[2] Therefore, Section 5, ArticleI of the Ohio Constitution does not preserve a right to a jury trial for the type of action filed against appellants.
 {¶ 46} Moreover, upon our review, we find that the action instituted by the State of Ohio was primarily equitable in nature. In the case sub judice, the State of Ohio sought an injunction to prevent appellants from engaging in the same type of violations that they had been engaging in for a period of years. It is clear from the complaint that the State's goal in bringing this action was to ensure appellants' compliance with R.C. Chapter 6109 and any regulations adopted thereunder and to protect the public. The fact that the State also sought penalties under R.C. 6109.33 does not change our analysis. See State of Ohio exrel., Betty Montgomery v. Portage Landfill and Development Co. (June 30, 1999), Portage App. No. 98-P-0033, 1999 WL 454623. In such case, the State sought both injunctive relief and civil penalties for violations of R.C. Chapter 6111. In holding that the appellants did not have a right to a jury trial, the court, *Page 14 
in the Portage Landfill case, stated, in relevant part, as follows: "The action instituted by the state was for the enforcement of the laws contained in R.C. Chapters 3734 and 6111. The relief sought by the state was primarily equitable in nature, and the request for the imposition of civil penalties in the complaint did not convert the action into one for the recovery of money only with the concomitant right to a trial by jury. See, e.g., Nozik, 1994 WL 613779, at 4 (wherein this court held that a request for civil penalties was incidental to the injunctive relief sought by the Ohio Environmental Protection Agency for alleged violations of R.C. Chapters 3734 and 6111)."[3] Id at 6. We find, in the case sub judice, that the claim for injunctive relief was predominant and that the claim for penalties was incidental to the same.
 {¶ 47} Appellants' third assignment of error is, therefore, overruled.
 IV {¶ 48} Appellants, in their third assignment of error, maintain that the $300,000.00 in penalties that the trial court awarded to the Ohio EPA were excessive, arbitrary, in appropriate and in violation of appellants' due process rights. We disagree.
 {¶ 49} R.C. 6109.33 states, in relevant part, as follows: "Any person who violates section 6109.31 of the Revised Code shall pay a civil penalty of not more than twenty-five thousand dollars for each violation, . . ." The trial court, in the case sub judice, ordered appellants Meadowlake Corporation and Meadowlake Ltd. to pay $300,000.00 "in view of their longstanding and intentional violations of R.C. Chapter 6109, the rules adopted under authority of R.C. 6109, and/or orders issued by the Director of the Ohio *Page 15 
Environmental Protection Agency, . . ." The trial court ordered that Meadowlake Corporation and Meadowlake Ltd. were jointly and severally liable for the $300,000.00.
 {¶ 50} Because of the mandatory language contained in R.C. 6109.33, a trial court has no discretion regarding whether or not to impose a civil penalty. See State v. Tri-State Group, Inc., Belmont App. No. 03 BE 61,2004-Ohio-4441 (construing R.C. 6111.09(A) which contains analogous language to R.C. 6109.33). The amount of the penalty imposed is within the discretion of the trial court based on the evidence in the case. Id. In order to find an abuse of discretion, we must determine that the trial court's decision was unreasonable, arbitrary or unconscionable,Blakemore v. Blakemore (1983), 5 Ohio St.3d 217, 450 N.E.2d 1140.
 {¶ 51} As noted by the court in State v. Tri-State Group, Inc, Belmont App. No. 03 BE 611, 2004-Ohio-4441, in determining the appropriate amount of a civil penalty, the trial court should consider the following factors: 1) the harm or threat of harm posed to the environment by the violations 2) the level of recalcitrance, defiance, or indifference demonstrated by the violator of the law (the defendant's good or bad faith); 3) the economic benefit gained by the violation; and, 4) the extraordinary costs incurred in enforcement. Id at paragraph 104, citing to State v. ex rel. Brown v. Dayton Malleable (1982), 1 Ohio St.3d 151,153, 438 N.E.2d 120. The court, in Tri State Group, Inc., further noted that, in determining a penalty, the trial court must remember that because a civil penalty is an economic sanction designed to deter violations, the penalty must be large enough to hurt the offender. Id at paragraph 104. *Page 16 
 {¶ 52} In the case sub judice, the trial court found that appellants had violated R.C Chapter 6109, rules adopted under authority of such Chapter, or orders issued by the Ohio EPA as follows:
 {¶ 53} "a. By operating, from 1999 to May 30, 2006, a `public water system' in Ohio, without a public water system license issued by the Director Ohio EPA;
 {¶ 54} "b. By failing, from July 1998 to May 30, 2006, (Meadowlake Corporation) and from May 2001 to May 30, 2006, (Meadowlake Ltd.) to collect total coliform routine samples at sites which are representative of water throughout the public water distribution system located on the Meadowlake property according to a written sample siting plan;
 {¶ 55} "c. By failing, from April 1995 through March 2001, (Meadowlake Corporation) to monitor for the presence of coliform bacteria once each calendar quarter in the Meadowlake property public water system;
 {¶ 56} "d. By failing, from April 2001 to September 2005, (Meadowlake Corporation) and from May 2001 to September 2005, (Meadowlake Ltd.) to sample the Meadowlake public water system four times each month for total coliform bacteria;
 {¶ 57} "e. By failing, from 1996 to 2000, (Meadowlake Corporation) to monitor annually to determine compliance with the maximum contaminant level for nitrate and from March 27, 2001 to August 2005, by failing to monitor monthly to determine compliance with the maximum contaminant level for nitrate and from March 27, 2001 to August 2005, by failing to monitor monthly to determine compliance with the maximum contaminant level for nitrate; *Page 17 
 {¶ 58} "f. By failing, from May 2001 to August 2005, (Meadowlake Ltd.) to monitor monthly to determine compliance with the maximum contamination level for nitrate;
 {¶ 59} "g. By failing, from March 27, 2001 to May 30, 2006 (Meadowlake Corporation) or from May 2001 to May 30, 2006 (Meadowlake Ltd.) to either install an approved disinfection and filtration treatment or in the alternative to provide water for the Meadowlake property public water system that would not be subject to the surface water treatment requirements of O.A.C. Rule 3745-81-71 through 3745-81-75;
 {¶ 60} "h. By failing, either classified as a ground water source or as using a surface water source, to issue a public notification of its/their failure to conduct quarterly or monthly total coliform routine monitoring of the Meadowlake property public water system — Meadowlake Corporation from April 1995 to May 30, 2006, and Meadowlake Ltd. From May 2001 to May 30, 2006;
 {¶ 61} "i. By failing, either classified as a ground water source or as using a surface water source, to issue public notification of its/their failure to conduct annual or quarterly nitrate monitoring of the Meadowlake property public water system-Meadowlake Corporation from July 1966 to May 30, 2006, and Meadowlake Ltd. From May 2001 to May 30, 2006;
 {¶ 62} "j. By having a well casing for the Meadowlake property public water system which terminates less than eight inches above finished grade of the land outside of the building in which the public water system source is located; the well is located in the basement of the former farmhouse and the well casing terminates more than eight inches below the outside ground level." *Page 18 
 {¶ 63} The trial court, in its August 4, 2006, Judgment Entry, further noted that the total number of noncompliance day violations committed by appellants exceeded 1,000.
 {¶ 64} While appellants argue that the penalties assessed by the trial court are excessive in light of the fact that no credible threat to the water supply at Meadowlake Golf Swim existed and, therefore, there was no threat to public health, as noted by appellee, appellants failed to comply with the required sampling requirements. The trial court specifically found that appellant failed to complete the required monthly nitrate testing and the required four monthly coliform monitoring samples. Appellants have not challenged such findings on appeal. As noted by the court in the Tri-State case, when an entity, such as in the case sub judice, disregards the statutory scheme by failing to sample the water, the Ohio EPA cannot fully assess the threat of harm.
 {¶ 65} Appellants further contend that the trial court should have considered, but failed to do so, appellants' financial ability to pay the penalty. Appellants note that, pursuant to the Dayton Malleable
case, which is cited above, the size of a business and its ability to pay a fine is a "significant factor" to be considered in determining the amount of a penalty. According to appellants, because it is a small seasonable business, the amount of the penalty "goes beyond deterrence and amounts of the most severe form of punishment, bankruptcy of the Meadowlake Defendants."
 {¶ 66} Appellants bore the burden of showing that the impact of a penalty would be ruinous or otherwise disabling. United States v. GolfWater Park Co., Inc. (S.D. Miss. 1998), 14 F.Supp.2d 854, 868. At the trial in this matter, Phillip Barr testified with respect to the extent of appellants' business operations. While there was no testimony *Page 19 
as to appellants' revenues, the burden was on appellants, through counsel, to present such evidence. Appellants, however, failed to do so.
 {¶ 67} In addition, there was evidence before the trial court that appellants intentionally violated R.C. Chapter 6109 and that appellants' violations were longstanding. Some of appellants' violations date as far back as 1995. As noted by the trial court, appellants were repeatedly advised of the violations over the years and yet failed to remedy the same. The trial court, in its entry, noted that with respect to some of the violations, appellant had been notified monthly over a period of years. Moreover, at the May 30, 2006 trial in this matter, Holly Kaloz of the Ohio EPA testified, with respect to nitrate sampling that, Meadowlake was within the top ten in the State of Ohio with respect to non-compliance. In addition, while Meadowlake Corporation applied for and received license to operate a public water system for the years 1996 though 1999, after such dates, it failed to apply for or receive any licenses. As a result of appellants' violations, the State of Ohio was forced to file the case sub judice against appellant and incur the expenses of the same, including the expenses incurred during the first trial, which resulted in a mistrial, and the subsequent trial. In turn, appellants avoided the costs associated with coliform sampling and nitrate sampling by failing to conduct such sampling for over fifty (50) sampling periods.
 {¶ 68} Moreover, while appellants contend the penalty imposed is excessive and thus violates the Eighth Amendment to the United States Constitution, the Eighth Amendment generally applies to criminal matters, not to civil matters. See Dayton Malleable, supra. at FN5, citing to Ingraham v. Wright (1977), 430 U.S. 651, 97 S.Ct. 1401. *Page 20 
 {¶ 69} In short, we find that the trial court did not abuse its discretion in assessing a $300,000.00 penalty against appellants. The trial court's decision was not arbitrary, unreasonable or unconscionable based upon the record.
 {¶ 70} Appellants' fourth assignment of error is, therefore, overruled.
 {¶ 71} Accordingly, the judgment of the Stark County Court of Common Pleas is affirmed.
 Edwards, J. Hoffman, P.J. and Farmer, J. concur. *Page 21 
 JUDGMENT ENTRY
For the reasons stated in our accompanying Memorandum-Opinion on file, the judgment of the Stark County Court of Common Pleas is affirmed. Costs assessed to appellants.
[1] In the case of Szerlip v. Szerlip, Knox App. No. 01CA16, 2002-Ohio-2540, 2002 WL 1270849, we held: "The Ohio Constitution, Section 16, Article I, undeniably affords the parties in a civil case the right to due process of law, the `basic thrust' of the clause being a requirement for notice and an `opportunity to be heard.' See OhioValley Radiology Assoc., Inc. v. Ohio Valley Hosp. Assn. (1986),28 Ohio St.3d 118, 124-125 [28 OBR 216], 502 N.E.2d 599. Szerlip at p. 5.
[2] While Chapter 6109 concerns safe drinking water, Chapter 6111 addresses water pollution control.
[3] The complete citation for the Nozik case is Mentor v. Nozik (Sept. 23, 1994), Lake App. No. 93-L-130, *Page 1