[Cite as *State ex rel. Cordray v. Evergreen Land Dev., Ltd.*, 2016-Ohio-7038.]

STATE OF OHIO, MAHONING COUNTY

IN THE COURT OF APPEALS

SEVENTH DISTRICT

| | | |
|---|---|---|
| STATE ex rel., RICHARD CORDRAY, | ) | CASE NOS. 15 MA 0115 |
| OHIO ATTORNEY GENERAL, | ) | 15 MA 0116 |
| | ) | |
| PLAINTIFF-APPELLEE, | ) | |
| | ) | |
| VS. | ) | OPINION |
| | ) | |
| EVERGREEN LAND DEVELOPMENT, | ) | |
| LTD., et al., | ) | |
| | ) | |
| DEFENDANTS-APPELLANTS. | ) | |

CHARACTER OF PROCEEDINGS: Civil Appeal from the Court of Common
Pleas of Mahoning County, Ohio
Case No. 07CV2546

JUDGMENT: Affirmed.

JUDGES:

Hon. Carol Ann Robb
Hon. Gene Donofrio
Hon. Mary DeGenaro

Dated: September 27, 2016

[Cite as *State ex rel. Cordray v. Evergreen Land Dev., Ltd.*, 2016-Ohio-7038.]
APPEARANCES:

For Plaintiff-Appellee:

Atty. David Emerman
Atty. Tasha Miracle
Asst. Attorney General
Environmental Enforcement Section
30 East Broad Street, 25th Floor
Columbus, Ohio 43215


For Defendant-Appellant:

Atty. Thomas Wilson
Atty. Bobbie  Flynt
Comstock Springer & Wilson Co., L.P.A.
100 Federal Plaza East
Youngstown, Ohio 44503

Atty. William Ramage
4822 Market Street, Suite 20
Youngstown, Ohio  44512

ROBB, J.

{¶1} Defendants-Appellants Evergreen Land Development, L.L.C. and its two members, Alfonso Valdes and Thomas Zebrasky, appeal the decision of the Mahoning County Common Pleas Court finding joint and several liability and imposing a $45,000 civil penalty for environmental violations. Valdes and Zebrasky argue the court erred in imposing personal liability upon them under the theory of personal participation (and erred by alternatively finding them personally liable under the theory of piercing the corporate veil). We uphold the court's finding that both members personally participated in the environmental violations. As piercing was an alternative holding by the trial court, we need not address the doctrine. Appellants' arguments as to the civil penalty imposed are also overruled. For the following reasons, the trial court's decision is affirmed.

STATEMENT OF THE CASE

{¶2} Valdez and Zebrasky formed Evergreen in anticipation of buying and developing a site at Pine Lake in Beaver Township, Ohio. As with most developments, they had to obtain a national pollutant discharge elimination system ("NPDES") permit. The permit requires the completion of a storm water pollution protection plan ("SWP3") and imposes standards for erosion and sediment controls in order to ensure rain does not relocate sediment from the property into the waters of the state.

{¶3} The permit was issued in April 2003. Ensuring compliance with this permit is a function of the Ohio Environmental Protection Agency ("EPA"). There were certain paperwork issues, including: a required Notice of Intent was signed by a non-owner of the company; discrepancies in the amount of acreage to be developed in various versions of the Notice of Intent; and the permit application used Ltd. instead of L.L.C. after the company's name.[1]

{¶4} Initially prompted by citizen complaints, the Ohio EPA visited the site at least eight times. An inspector testified there were erosion control and sediment

control violations during every visit; he sent multiple letters to Evergreen describing the various violations. (Tr. 328). He also engaged in meetings and telephone conversations with Evergreen representatives about the issues.

{¶5} At his August 2003 visit, a complete copy of the SWP3 was not onsite as required. (When it was later provided, there were deficiencies and issues with the post-construction storm water management plans.) As for sediment control, a silt fence was present but did not meet the permit requirements. A silt fence is only considered effective for capturing run-off for the property within 225 feet of the fence; Evergreen's fence had 1,600 feet behind the fence on a steeply sloped lot. Plus, a silt fence is not capable of controlling concentrated run-off. Despite this limitation, run-off was being directed via a channel to the fence instead of to a necessary pond. (Tr. 75). The inspector also noticed erosion control had not been implemented; the site was bare of vegetation or other covering. The permit required erosion control measures within two to seven days of grading depending on how close to the lake the land was situated. (Tr. 66-67, 72).

{¶6} The inspector visited the property again in October 2003. Silt ponds had been installed but were not adequately constructed or the run-off was not being directed to them. (Tr. 160-161). Erosion control still did not exist. A meeting was held on October 22 to discuss the violations. When the inspector returned in March 2004, the site was not stabilized against erosion, and rain water run-off was not entering the silt pond constructed for that purpose. (Tr. 95-96). In April 2004, the inspector learned that sanitary sewers had been installed prior to the approval of the Permit to Install, which the Ohio EPA did not issue until June 2004. (Tr. 122-123).

{¶7} At the September 2005 inspection, the site was still not stabilized, including the bare slopes of the sediment pond itself. (Tr. 101, 112). The inspector emphasized that if erosion control such as seeding does not take, the developer must keep trying until they are successful (which may require the replacement of topsoil over rock) or the use of mulch or matting instead. (Tr. 350). In addition, the sediment control in the property's northeast corner had been removed, due to the

---

[1] A limited partnership has different liability rules than a limited liability company, e.g. the general partner is personally liable. *See* R.C. 1782.24(A)-(B) (a general partner in a limited partnership is subject to all the

completion of a structure, but it was not replaced with other sediment controls to capture run-off from that section before it entered the lake. (Tr. 99, 332). Erosion rills and larger gullies were evident on the property. (Tr. 107-109). A silt fence was not installed properly; it was not trenched, allowing water to run under a control meant to pond and filter water. (Tr. 110-111).

{¶8} At the April 2006 inspection, erosion control was still lacking, sediment-laden run-off was still entering the lake, an alternative sediment control had not been installed, and inlet protection was improperly constructed. (Tr. 116). Appellants discontinued construction due to a housing recession and then a foreclosure action, which is said to have resulted in a $4.5 million judgment against them.

{¶9} On July 13, 2007, the State of Ohio Attorney General's Office ("the state") filed an action against Appellants on behalf of the Ohio EPA under Chapter 6111. Pursuant to R.C. 6111.07(A), "No person shall violate or fail to perform any duty imposed by sections 6111.01 to 6111.08 of the Revised Code or violate any order, rule, or term or condition of a permit issued or adopted by the director of environmental protection pursuant to those sections. Each day of violation is a separate offense." Any person who violates R.C. 6111.07(A) shall pay a civil penalty. R.C. 6111.09(A). "The attorney general, upon written request by the director of environmental protection, shall commence an action under this section against any person who violates section 6111.07 of the Revised Code." R.C. 6111.09(B). *See also* R.C. 6111.07(B) ("The attorney general, upon written request of the director, shall bring an action for an injunction against any person violating or threatening to violate this chapter or violating or threatening to violate any order, rule, or condition of a permit issued or adopted by the director pursuant to this chapter.")

{¶10} The complaint outlined multiple failures to comply with the NPDES permit, water quality violations, and a failure to obtain a Permit to Install before installing the sanitary sewer. The complaint asserted Valdez and Zebrasky were personally liable for the violations. Due to the company's use of Ltd. on paperwork submitted to the Ohio EPA, the complaint initially named Evergreen Land

liabilities of a partner in a standard partnership).

Development, Ltd. as a defendant.  This entity was dismissed after Evergreen Land Development, L.L.C. was added as a defendant.

{¶11} On January 14, 2009, the magistrate granted partial summary judgment, finding the violations occurred as alleged.  On February 11, 2009, the trial court adopted the magistrate's decision and entered judgment accordingly.  This left issues concerning the personal liability of Valdez and Zebrasky and the amount of civil penalty to be imposed.  These issues were tried to a magistrate in October 2014, where testimony was presented by the inspector, another Ohio EPA agent, and Zebrasky.  The deposition of Valdez was submitted as well.  Photographs, documents, and letters were admitted as exhibits.

{¶12} The evidence showed this limited liability company was formed for this particular project and engaged in no other projects.  Zebrasky supervised the site for over two years.  In speaking to the inspector, he called himself an owner and called Valdes his partner.  Both Valdes and Zebrasky personally guaranteed bank loans to the limited liability company.  Valdes spoke of an initial June 2003 loan and a renewed loan in August 2005 for over $6 million.  (Depo. at 19); (Tr. 223).  Valdes says he personally loaned the company $3.3 or $3.4 million.  (Depo. at 19, 28).  Zebrasky believed it was $1.5 to $2 million, suggesting the loans were a regularly occurring method of running the company; he said when money was due (such as for a loan payment), Valdes would write the check, apparently from his own account.  (Tr. 224-225).  Valdes said he lost significant personal money by investing in Evergreen.  Other evidence is reviewed under the pertinent headings below.

{¶13} On March 11, 2015, the magistrate issued a decision imposing personal liability on Valdez and Zebrasky and finding them jointly and severally liable with Evergreen for a $45,000 civil penalty.  The magistrate found the members personally liable because they personally participated in the violations; they knew the violations were occurring, had the authority to prevent the violations from continuing, and failed to exercise their authority in such manner.  The magistrate alternatively found them individually liable under the test for piercing the corporate veil, stating:  Evergreen had no separate mind, will, or existence from that of its members; the members exercised control over the company to commit violations of Chapter 6111; and the

state was injured by the violations, which created actual environmental harm and a risk of such harm. Appellants filed objections to the magistrate's decision.

{¶14} On June 15, 2015, the trial court overruled the objections, adopted the magistrate's decision, and entered judgment against Appellants. Evergreen and Valdez filed a notice of appeal, resulting in 15 MA 115. They filed a joint brief, setting forth one general assignment of error and three issues presented dealing with: piercing the corporate veil; personal participation; and the amount of the penalty. Zebrasky filed a separate notice of appeal, resulting in 15 MA 116. He filed his own brief, setting forth three assignments of error dealing with: the amount of the penalty; personal liability; and the amount of the penalty attributable to him. This court consolidated the appeals, and the state filed one brief in response.

PERSONAL PARTICIPATION IN THE VIOLATIONS

{¶15} In general, a corporate officer is not liable in a case *merely* due to his status as a corporate officer. *Belvedere Condominium Unit Owners' Assn. v. R.E. Roark Cos., Inc.*, 67 Ohio St.3d 274, 287, 617 N.E.2d 1075 (1993) ("A fundamental rule of corporate law is that, normally, shareholders, officers, and directors are not liable for the debts of the corporation."); *HLC Trucking v. Harris*, 7th Dist. No. 01BA37, 2003-Ohio-694, ¶ 48 ("The general rule is that corporate officers are not held personally liable for acts of the corporation merely by reason of their official relationship to the corporation."). However, this protection does not extend to the personal acts and omissions of the corporate officer. *Yo-Can, Inc. v. The Yogurt Exchange, Inc.*, 149 Ohio App.3d 513, 2002-Ohio-5194, 778 N.E.2d 80, ¶ 46-47 (7th Dist.) (corporate officer can be jointly and severally liable with corporation where he personally engaged in various transgressions).

{¶16} Pursuant to statute, members or managers of a limited liability company are not personally liable to satisfy any court judgment or to satisfy any debt, obligation, or liability of the company solely by reason of being a member or manager of the limited liability company. *See* R.C. 1705.48(B). However, the next division specifies: "Nothing in this chapter affects any personal liability of a member of a limited liability company or any manager of a limited liability company for the member's or manager's own actions or omissions." R.C. 1705.48(C).

**{¶17}** The personal participation theory of liability is distinct from piercing the corporate veil, the alternative theory of liability utilized by the trial court here. *See, e.g., Snapp v. Castlebrook Builders, Inc.*, 3d Dist. No. 17-12-22, 2014-Ohio-163, 7 N.E.3d 574, fn. 5; *Jack F. Neff Sand & Gravel, Inc. v. Great Lakes Crushing, Ltd.*, 11th Dist. No. 2012-L-145, 2014-Ohio-2875, ¶ 52; *Dehoff v. Veterinary Hosp. Operations of Central Ohio, Inc.*, 10th Dist. No. 02AP-454, 2003-Ohio-3334, ¶ 89; *Yo-Can*, 149 Ohio App.3d 513 at ¶ 44-49. The parties agree the case law pertinent to the personal participation theory of agency law as applied to corporate officers applies to a case involving members of a limited liability company.

**{¶18}** The question becomes whether the defendants specifically directed the particular environmental violations or participated or cooperated therein. *See Jack F. Neff Sand & Gravel*, 11th Dist. No. 2012-L-145 at ¶ 52; *Young v. Featherstone Motors, Inc.*, 97 Ohio App. 158, 171, 124 N.E.2d 158 (1954). In a recent case, the Eleventh District found an alleged corporate officer personally liable for violations of R.C. Chapter 6111 due to evidence of his individual participation. *State ex rel. DeWine v. Deer Lake Mobile Park, Inc.*, 11th Dist. No. 2013-G-3156, 2015-Ohio-1060, 29 N.E.3d 35, ¶ 57 (he argued he was merely an employee, but the court found personal liability due to his individual participation without regard to his status as a corporate officer). The court viewed the defendant's duties, acts, and omissions as the manager of Deer Lake. *See id.*

**{¶19}** It was emphasized that the defendant *had knowledge of water pollution violations, had authority to correct them, but did not correct them. Id. See also City of Cincinnati v. Duval*, 22 Ohio App.2d 208, 210, 260 N.E.2d 127 (1st Dist.1970) (explaining that a corporate officer is liable for the violation of an ordinance where he actively engages in the behavior regulated or knew of the violation or proposed violation, was authorized to prevent it, but failed to prevent it). The *Deer Lake* court also noted that the statute being enforced, which is the same as the one here, imposed liability for violations on individuals. *Id.* at ¶ 58-59, citing, R.C. 6111.07(A) (No person shall violate or fail to perform any duty imposed by R.C. 6111.01 to 6111.08 or violate any rule or term of a permit); R.C. 6111.01(I), citing R.C. 1.59(C) (for the definition of "person" as including an individual). *See also* R.C. 6111.09(A)

("Any person who violates section 6111.07 of the Revised Code shall pay a civil penalty of not more than ten thousand dollars per day of violation.").

**{¶20}** In a similar vein, the Twelfth District held a corporate officer who personally violated the Ohio Consumer Sales Practices Act can be personally liable for a statutory violation under that act. *See Mohme v. Deaton*, 12th Dist. No. CA200512-133, 2006-Ohio-7042, ¶ 9-18. Cases involving statutory violations have additional support beyond the personal participation theory of liability: the language of the statute applies to the individual who violates the statute and to a corporation. This court recently cited *Deer Lake Mobile Park* with approval in a case enforcing nuisance statutes and asbestos statutes that applied to an owner or operator. *See State ex rel. DeWine v. Sugar*, 7th Dist. Nos. 14 JE 0004, 14 JE 0006, 2016-Ohio-884, ¶ 35, citing *Deer Lake Mobile Park*, 11th Dist. No. 2013-G-3156.

**{¶21}** Valdes argues the evidence did not support the finding that he was personally liable under a personal participation theory because he did not direct, participate in, or cooperate with the commission of any violation. He states he engaged in good faith efforts to comply with Ohio EPA regulations. He points out that Evergreen hired another company to coordinate environmental efforts for Evergreen. Zebrasky makes a similar observation and claims he had no control over the activities at the site. He blames independent contractors for creating and failing to correct the environmental violations. He states he could not exercise control as he was only a 49% shareholder. Zebrasky also asserts a lack of participation after he was replaced as site supervisor in August 2005 and contests the allocation of liability.

**{¶22}** We begin by pointing out that this is not a criminal case, and the court's certainty as to liability need not be beyond a reasonable doubt. *See State ex rel. Brown v. East Liverpool*, 7th Dist. No. 80-C-19 (May 6, 1981). Nor must there be clear and convincing evidence, which is the measure of proof which produces a firm belief in the mind of the fact-finder. *See generally Cross v. Ledford*, 161 Ohio St. 469, 477, 120 N.E.2d 118 (1954) (for definition).

**{¶23}** In this type of environmental enforcement action, the state is only required to prove its claim by a preponderance of the evidence. *State ex rel. DeWine v. Valley View Ents., Inc.*, 11th Dist. No. 2014-T-0051, 2015-Ohio-1222, ¶ 24

(reversing the trial court's decision where there was evidence of environmental violations such as the installation of the sewer before the permit was issued and the failure to complete an SWP3), citing *State ex rel. Brown v. East Liverpool*, 7th Dist. No. 80-C-19. *See also* R.C. 6111.09(A) ("Any action under this section is a civil action, governed by the Rules of Civil Procedure and other rules of practice and procedure applicable to civil actions."). Preponderance of the evidence means the greater weight of evidence that is necessary to alter the equilibrium. *State v. Stumpf*, 32 Ohio St.3d 95, 102, 512 N.E.2d 598 (1987). It is that proof which leads the trier of fact to find that the existence of the contested fact is more probable than its nonexistence. *Id.*

**{¶24}** Next, we reiterate that the existence of environmental violations is not in dispute. Summary judgment was entered against Evergreen as to liability for these violations, and this decision was not appealed. The limited liability company violated its permit, various regulations constituting the permit conditions, and state statutory law. Pursuant to R.C. 6111.07(A): "No person shall violate or fail to perform any duty imposed by sections 6111.01 to 6111.08 of the Revised Code or violate any order, rule, or term or condition of a permit issued or adopted by the director of environmental protection pursuant to those sections."

**{¶25}** Both Valdes and Zebrasky participated in the decision to install the sanitary sewer without waiting for the Ohio EPA's Permit to Install, which they knew had not been issued. Zebrasky testified that the county gave them permission to install the sanitary sewer and suggested county presence during the installation. (Tr. 226-227). Valdes testified that they went to the county sanitary engineer's office prior to installing the sewer. (Depo. at 33). He said Zebrasky told him it was a common local practice to install the sanitary sewer in the absence of the EPA permit if the county had issued a letter (notwithstanding that the letter expressly said they were awaiting the EPA Permit to Install). Valdes acknowledged he was advised that preemptive installation came with risks, suggesting the only risk was potential changes to the submitted design. (Depo. at 34).

**{¶26}** As for the multiple environmental violations involving erosion and sediment controls, there was testimony indicating the participation of both Valdes and

Zebrasky in the continuing violative state of the property. Valdes was a 51% owner, and Zebrasky was a 49% owner. Although the operating agreement provided Valdes would run the day-to-day operations, Valdes said he asked Zebrasky to run the operations at the construction site as Valdes lived in Puerto Rico. In fact, Zebrasky was paid $8,000 per month for this supervisory role, plus $1,500 for the company's use of his local office. Valdes was initially paid $4,000 per month until mid-2005, when he says he stopped taking a salary. (Depo. at 19).

{¶27} Zebrasky was at the site issuing constant reports in 2003, 2004, and part of 2005; Valdes was at the site every two to six weeks during that time (depending on whose testimony is believed) and even more often in 2005 and 2006. Valdes testified the decisions were to be jointly made; although, he claimed Zebrasky was making decisions without consulting him. (Depo. at 20, 22). Zebrasky claimed that any purchase order for expenditures on stabilization, for instance, had to be approved by Valdes. (Tr. 385). Valdes was to be in charge of finances, but Zebrasky made purchases as well.

{¶28} They had no employees at the site. Independent contractors were used for all development and construction work. Zebrasky recommended the contractors used, and Valdes approved them. Zebrasky approved the work at the site as it was completed. (Tr. 381). He was an engineer. He attended meetings about the environmental concerns and spoke to the inspector about the issues. Zebrasky testified that he was the "eyes and ears" for Valdes and spoke to him daily. (Tr. 222). Valdes said that after he replaced Zebrasky at the site due to a "falling out" in August 2005, Zebrasky continued to "interfere" in decision-making.

{¶29} There was testimony that both Valdes and Zebrasky had control over the activities at the development site. Both knew of the violations, had the authority to stop the violations from occurring, and failed to ensure the violations discontinued. Although Evergreen hired contractors for excavation and engineering, the violations at the site were reported to Evergreen and relayed to the two members. These were the only two people with authority to order the violations remedied. They both had the authority to direct the contractors upon the inspector's various notices and other information imparted through meetings and telephone calls. Yet, they did not order

the preventative measures as instructed by the Ohio EPA or ensure attempts were successful or reinstituted.

**{¶30}** Extensive erosion occurred at the site due to failure to successfully implement erosion controls over the years. Sediment was seen entering the lake in plumes. (Tr. 67-68). Displaced sediment was viewed on the shoreline of the site. These are injuries. Had the required measure been implemented timely and properly, the amount of sediment would have been reduced. (Tr. 126). Sediment is considered a pollutant to the waters of the state. (Tr. 34, 126-127).

**{¶31}** The erosion control failures were evident, obvious, and continuing. The failure of any attempt at growing vegetation on dormant land was unmistakable. The sediment control issues were explained in letters, which Zebrasky forwarded to Valdes. There were discussions at meetings. Zebrasky said he relayed all matters to Valdes. Valdes had authority under the operating agreement to make operational decisions, he controlled the payment of money, and he approved work orders. Valdes and Zebrasky were informed of the violations but failed to resolve them, although they kept reassuring the inspector they would.

**{¶32}** After Zebrasky was replaced as supervisor, the violations he watched (and allowed to remain) continued to exist. At that time, Valdes did not ensure that sediment-laden run-off was successfully directed to appropriate controls. And, there is no indication that Valdes ordered erosion control measures to protect the soil from eroding, thereby protecting the lake from the intrusion of sediment. The fact that independent contractors were used for excavating and engineering does not relieve the owners from responsibility for the decisions they made or the orders they failed to make after receiving environmental notices. Someone had to be hired to re-seed the site or to place erosion matting if seeding remained unsuccessful. Such hiring was solely under the control of Zebrasky or Valdes.

**{¶33}** Personal participation in the environmental violations is a valid finding supported by the evidence: a rational fact-finder could find personal participation, and the decision is not contrary to the manifest weight of the evidence. The fact that the state may have employed circumstantial evidence and inference in support of some participation instances does not equate to mere speculation. Circumstantial

evidence has the same probative value as direct evidence. *State v. Jenks*, 61 Ohio St.3d 259, 272–273, 574 N.E.2d 492 (1991). Moreover, rational inferences can be drawn based upon facts in the record and even based upon a combination of a fact in the record and another rational inference. *See Hurt v. Charles J. Rogers Transp. Co.*, 164 Ohio St. 329, 333, 130 N.E.2d 820 (1955) (an inference which is based in part upon another inference and in part upon factual support is a parallel inference and is universally approved if it is a reasonable conclusion).

{¶34} As to Zebrasky's argument that he should be less liable because he was replaced as site manager in August or September of 2005 and violations continued into 2006, the imposition of joint and several liability was within the province of the fact-finder. The trial court specifically responded to this argument by stating that even if all events occurring after Zebrasky's replacement as supervisor were ignored, the penalty was appropriate.

{¶35} Zebrasky actively supervised the site for at least two years with violations from the beginning. He spoke to Ohio EPA representatives in person and on the telephone. Various issues existing after his replacement could essentially be viewed as continued violations from the period during which Zebrasky was in charge of the site. The September 2005 inspection occurred near the date Valdes replaced Zebrasky. The violations were not the type of conditions that would just appear on inspection day. In addition, the 2006 inspection dealt with items uncorrected from the prior inspection. All in all, the trial court rationally allocated the liability as joint and several.

{¶36} The trial court's decision as to personal liability is upheld on the basis of personal participation in the environmental violations. This court need not reach the theory of piercing the corporate veil, which the trial court found was an alternative for imposing liability on Zebrasky and Valdes.

<u>CIVIL PENALTY</u>

{¶37} Appellants argue the civil penalty of $45,000 was excessive. First, Zebrasky argues the state failed to prove any damages. He claims that, although there was testimony on the risks of excess sediment, there was no evidence that these risks actually occurred. Zebrasky argues the inspector's testimony that

sediment run-off can affect a water company's pumps is inapplicable to this case. He notes that Aqua Ohio draws drinking water from Evans Lake which is separated from Pine Lake by a creek, making it unlikely that sediment from the development would reach Evans Lake in order to affect the pumps.[2] He also points out there was no indication an algae bloom resulted here or sediment run-off caused the death of fish found on the shoreline at the site.

**{¶38}** Initially, we address the suggestion that the state failed to show a harm occurred and thus failed to prove damages. Chapter 6111 embodies the response of the General Assembly to the Federal Water Pollution Control Act Amendments of 1972, which has the goal of eliminating the discharge of pollutants into the qualifying waters. *State ex rel. Brown v. Dayton Malleable, Inc.*, 1 Ohio St.3d 151, 154, 438 N.E.2d 120 (1982). *See also State v. Tri-State Group, Inc.*, 7th Dist. No. 03 BE 61, 2004-Ohio-4441, ¶ 102 (the state's purpose is to promote the goal of clean water in the state of Ohio). Sediment is considered a pollutant under this chapter. *See* R.C. 6111.01(A),(D).

*{¶39}* When an environmental violation is committed, the fact that the state was injured is a concept built into the statutory framework and regulatory scheme; the violation of the law presupposes an injury to the state. *See, e.g., State ex rel. Petro v. Mercomp*, 167 Ohio App.3d 64, 2006-Ohio-2729, 853 N.E.2d 1193 (8th Dist.), ¶ 32-36 (the injury to the state, for purposes of the third prong of the piercing test, was the continued failure to comply with the environmental regulations), citing *Ackerman v. Tri-City Geriatric & Health Care, Inc.*, 55 Ohio St.2d 51, 378 N.E.2d 145 (1978) (in addressing a similar argument regarding the necessity of proof of actual harm, the Court held it would be redundant for the state to show irreparable damage or lack of an adequate legal remedy once the state proves that conditions exist which the General Assembly has deemed worthy of injunctive relief).

---

[2] We note there is no dispute Pine Lake qualifies as "waters of the state." *See* R.C. 6111.01(H) (defining "waters of the state" as all streams, lakes, ponds, marshes, watercourses, waterways, wells, springs, irrigation systems, drainage systems, and other bodies or accumulations of water, surface and underground, natural or artificial, regardless of the depth of the strata in which underground water is located, that are situated wholly or partly within, or border upon, this state, or are within its jurisdiction, except those private waters that do not combine or effect a junction with natural surface or underground waters).

**{¶40}** Furthermore, a court's finding of an environmental violation under R.C. 6111.07(A) requires the imposition of a civil penalty. *Tri-State Group*, 7th Dist. No. 03 BE 61 at ¶ 103. Pursuant to R.C. 6111.09(A), "Any person who violates section 6111.07 of the Revised Code shall pay a civil penalty of not more than ten thousand dollars per day of violation." Because of the mandatory language in R.C. 6111.09(A), a trial court has no discretion on whether to impose a civil penalty. *Tri-State Group*, 7th Dist. No. 03 BE 61 at ¶ 103; *State ex rel. Dann v. Meadowlake Corp.,* 5th Dist. No. 2006 CA 00252, 2007-Ohio-6798, ¶ 50 (construing an analogous environmental statute); *Leslie Salt Co. v. United States*, 55 F.3d 1388, 1397 (9th Cir.1995) (agreeing with other circuits that civil penalties are mandatory under the Clean Water Act). *See also Bergman v. Monarch Constr. Co.*, 124 Ohio St.3d 534, 539, 2010-Ohio-622, 925 N.E.2d 116, ¶ 16 (a trial court has no discretion to refrain from ordering an employer who violated prevailing-wage laws to pay statutory civil penalties of 25% to an underpaid employee and 75% to the director of commerce).

**{¶41}** There was undisputed proof of erosion and sediment-laden run-off entering the lake. As the purpose of the NPDES permit's sediment and erosion controls is to reduce erosion and sediment run-off into the waters of the state, the mere lack of required environmental controls in violation of the law is injurious to the state. How injurious the various violations were is a question to be answered in formulating *the amount* of the civil penalty.

**{¶42}** As to the amount of the civil penalty in a particular case, the trial court has broad discretion in formulating a proper sanction (that is under the statutory maximum). *Dayton Malleable*, 1 Ohio St.3d at 157; *Tri-State Group,* 7th Dist. No. 03 BE 61 at ¶ 103 (leaving the decision to the trial court's informed discretion based on the totality of the evidence in the case at hand). The trial court's decision regarding the amount of the civil penalty should only be reversed if it is unreasonable, arbitrary, or unconscionable. *Dayton Malleable*, 1 Ohio St.3d at 157.

**{¶43}** Various factors can be relevant to the amount of the civil penalty, including: (1) the harm or threat of harm posed to the environment; (2) the level of recalcitrance, defiance, or indifference demonstrated and whether the defendant acted in good faith or bad faith; (3) the economic benefit gained by the violation; and

(4) the extraordinary costs incurred in enforcement. *Dayton Malleable*, 1 Ohio St.3d at 153, 156-157 (permitting use of these federal EPA factors for determining the amount of penalty under Chapter 6111); *Tri-State Group,* 7th Dist. No. 03 BE 61 at ¶ 104. *See also State ex rel. Cordray v. Tri-State Group, Inc.*, 7th Dist. No. 07-BE-38, 2011-Ohio-2719, ¶ 71.

{¶44} Additionally, the penalty is to be both a general and a specific deterrent, i.e. it should deter others and deter the violator in the case at bar. *See Dayton Malleable*, 1 Ohio St.3d at 157. The trial court can consider the financial condition of the violator in order to ensure the civil penalty is a large enough economic sanction that it will deter violations of Chapter 6111 by being more than a "slap on the wrist." *Id.* at 156-157. The trial court can also consider whether a fine would result in the violator's bankruptcy. *Id.*

{¶45} Still, in order to be effective, the amount of the penalty must be greater than the cost of compliance with the regulation. *Id.* at 157. The totality of the circumstances and the specific facts of each case guide the court's discretion. The factors are useful, but no one proposition governs.

{¶46} Here, the main violations relate to the failure to: ensure successful erosion control measures; implement or maintain sediment controls; submit a complete SWP3; and obtain a sanitary sewer permit prior to installing a sanitary sewer for a development. It is true that some sediment enters a lake naturally during a rainfall even where no construction is occurring or even when a construction site is properly controlled. However, this natural occurrence does not mean excess sediment from a bare and poorly controlled development site does not negatively affect the lake.

{¶47} Actual erosion was apparent, and the lack of ground coverage was long-lasting with issues remaining at least 2.5 years after they were initially identified. Sediment was seen pluming into the lake from the site. Contrary to the assertion of Valdes, it was not unrealistic to find a risk of harm to the environment from excess sediment entering the lake. The inspector testified to reasons behind the state's desire to decrease non-natural sediment laden run-off from entering the lake.

**{¶48}** The excess sediment: interferes with fish gills and thus the ability of a fish to extract oxygen from the water; blocks sunlight from reaching plant life; smothers the ecosystem and degrades the habitat at the bottom of the lake, where macroinvertebrates live and eggs are laid; carries into the lake other pollutants such as phosphorous, which is consumed by algae and could cause an algae bloom; and hastens the need to dredge an impoundment of water earlier than otherwise needed. (Tr. 34-36, 128-129, 135, 190). Although not to the extent as various other pollutants, the entry of excess sediment pouring into the lake from a bare development site causes a risk of harm to the environment.

**{¶49}** Appellants dispute any finding that they were defiant, recalcitrant, or indifferent to the law, claiming they attempted in good faith to comply by: repeatedly revising the SWP3; trying to plant grass twice; entrusting an independent contractor to comply with the permit or correct the violations; adjusting the sediment controls; and installing Stormceptors at a cost of $35,000. They blame the decision to install the sanitary sewer prior to being issued a permit on the advice from a local government office.

**{¶50}** They may have verbally responded to notices quickly in order to assuage concerns, but they did not successfully implement the items necessary to secure the site. Considering the long-term failure to establish ground cover over the unworked land, including the walls of the sediment pond, indifference is not an unreasonable conclusion. Although defiance may be lacking, it is not unreasonable to find some level of recalcitrance in this case.

**{¶51}** Appellants urge there was no economic benefit from their violations. However, installing a sanitary sewer without waiting for a permit is related to speeding along construction in order to make a return on the sale of a completed residence. The construction would also proceed ahead of schedule by grading before sediment controls were in place. The erosion and sediment control violations essentially involved the failure to expend funds at all or the failure to timely expend funds on materials and labor. As an example, the inspector testified the Ohio Department of Transportation allocates $2,000 per acre for stabilization (erosion control). Failure to dig a trench for the sediment fence could be seen as an attempt

to save money, with the fence placed for show. The initial lacking sediment pond could be seen as a similar attempt.

{¶52} Contrary to Appellants' position, the fact that they got caught and had to expend (some of) the required money eventually does not mean they did not economically benefit at the time of certain violations. That is to say, a developer who never gets caught and never spends the money (on seeding or mulching, diversion, ponds, inlets, and pipes) is in a better position economically and time-wise than the developer who complies with all permit and other legal requirements. The risk versus reward evaluation by a developer must result in the developer wanting to avoid the risk at the outset. *See Dayton Malleable*, 1 Ohio St.3d at 157 (the civil penalty must be more than the abatement or compliance costs).

{¶53} A goal of the regulatory system is to deter others from believing the violation is a good risk to take or from factoring in the violation as a mere "cost of doing business." It is also to deter the violator. *See id.* at 156-157. Appellants state Evergreen is no longer building at the site; the initial reason for this was due to the housing recession, and later the bank foreclosed on the property. This does not mean the violator is not subject to the principle of deterrence; deterrence is not merely about a particular property, but about an actor. There is also the goal of deterring the company's owners in their future dealings in matters concerns the environment.

{¶54} There is a suggestion on appeal that the fine would result in bankruptcy. Appellants bore the burden of showing the impact of a penalty would be financially ruinous. *See Meadowlake Corp.*, 5th Dist. No. 2006 CA 00252 at ¶ 66. The magistrate recognized the bank foreclosed and obtained a judgment against the three Appellants for $4.5 million. There is no indication of the value of the land that may be realized at a sale.

{¶55} Appellants argue the factor involving enforcement costs weighs in their favor. The costs may not have been extraordinary in comparison to other cases. Still, it is relevant that the Ohio EPA visited the site eight times. The inspector who testified visited the site six times. He went to meetings, sent notices, and engaged in telephone conversations as to the various violations. As the sole inspector in

Northeast Ohio at the time, the inspector's work on this site prevented him from evaluating other sites that otherwise would have been inspected. He noted that most violators comply after one (sometimes two) notices and do not require this multitude of visits. The state's resources are finite, and where an employee devotes too much time to one site, the state's resources are diverted from other potential inspections that could have resulted in important revelations.

**{¶56}** Finally, the state claimed, that with each violation carrying a maximum daily penalty of $10,000, the technical maximum allowable penalty was over $7 million. The state requested a civil penalty of $90,000. The court considered Appellants' arguments in mitigation and imposed a penalty of $45,000.

**{¶57}** We cannot conclude the amount of the penalty was unreasonable, arbitrary, or unconscionable. Although a different fact-finder could have exercised his or her discretion differently, we do not substitute our judgment for that of the trier of fact. *See Berk v. Matthews*, 53 Ohio St.3d 161, 169, 559 N.E.2d 1301 (1990) (in applying the abuse of discretion standard, an appellate court is not free to substitute its judgment for that of the trial judge).

**{¶58}** For all of the foregoing reasons, the trial court's decision is upheld.

Donofrio, P.J., concurs.

DeGenaro, J., concurs.